**JICARILLA APACHE TRIBE,
Plaintiff-Appellee,**

**v.**

**UNITED STATES of America, Cecil Andrus, Secretary of the Interior of the United States of America,**

**and**

City of Albuquerque, New Mexico, and State of New Mexico ex rel., Interstate Stream Commission, Intervenors-Appellants.

**Nos. 80–1704, 80–1705 and 80–1759.**

United States Court of Appeals, Tenth Circuit.

Argued May 29, 1981.

Decided July 29, 1981.

Martin Green, Dept. of Justice, Washington, D. C. (Richard A. Simms and V. Henry Rothschild, Sp. Asst. Attys. Gen., Santa Fe, N. M., for intervenor-appellant State of N. M., Malcolm W. deVesty and Barbara Stephenson, Asst. City Attys., Albuquerque, N. M., for intervenor-appellant City of Albuquerque, with him on the brief), for defendants-appellants and intervenors-appellants.

Robert J. Nordhaus and Lester K. Taylor, Nordhaus, Haltom & Taylor, Albuquerque, N. M., for plaintiff-appellee.

Before DOYLE and SEYMOUR, Circuit Judges, and BOHANON,* District Judge.

WILLIAM E. DOYLE, Circuit Judge.

This action was originally filed by the Jicarilla Apache Tribe in the year 1975. The object of the suit was to obtain a general adjudication of water rights on the Navajo River and its tributaries in the State of New Mexico. The tribe also sought an injunction prohibiting alleged illegal diversions on the Navajo River by the Secretary of the Interior pursuant to the San Juan-Chama Project Act, 43 U.S.C. 615 *et seq.* (1976).

In July 1977 the district court ordered the case dismissed for lack of jurisdiction on the basis that a water right adjudication of the entire San Juan River system, including the Navajo River, was already pending in state court. This court upheld the dismissal relative to the adjudication of water rights, but remanded the case for trial of the question of alleged illegal diversion from the Navajo. *Jicarilla Apache Tribe v. United States*, 601 F.2d 1116 (10th Cir.), *cert. denied*, 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979).

During the pendency of the mentioned appeal, the Bureau of Reclamation[1] signed an agreement with the City of Albuquerque under which the Bureau agreed to deliver all of the city's share of the San Juan-Chama Project water for storage in Elephant Butte Reservoir. Thereupon, the tribe amended its complaint and the action was changed to one in which the tribe sought a declaratory judgment that the agreement between the Bureau and the City was void and contrary to law. The City of Albuquerque and the State of New Mexico, ex rel. Interstate Stream Commission, were allowed to intervene.

At the second trial the issues were limited to the following:

(a) Whether storage by Albuquerque of San Juan-Chama water in Elephant Butte would constitute a beneficial use;

(b) Whether the agreement for storage by the City was authorized by Congress; and

(c) Whether the City was required to obtain a permit from the New Mexico State Engineer for such storage.

---

* Honorable Luther L. Bohanon, Senior Judge, U. S. District Court, Oklahoma City, Oklahoma, sitting by designation.

1. The Bureau of Reclamation's name has been changed to the Water and Resources Services, but to be consistent with the earlier judicial determinations, the old designation will be used in this opinion.

The trial court found for the defendants on the first issue, but for the plaintiffs on the second and third issues. The agreement was, therefore, declared invalid. The identical issues which were tried below are presented here on appeal by defendants.

The San Juan-Chama Project diverts water from the Navajo River in Colorado. The Navajo River flows from Colorado into New Mexico through the Jicarilla Reservation and back into Colorado to eventually join the San Juan River, a tributary of the Colorado River. Diverted water is carried through tunnels under the Continental Divide and proceeds into Heron Reservoir. This reservoir is located on a small tributary to the Rio Chama. The Rio Chama runs into the Rio Grande. Albuquerque is on the Rio Grande about 100 miles downstream from Heron Reservoir. Elephant Butte Reservoir is about 150 miles downstream from Albuquerque on the Rio Grande. Appended to this opinion is a map which was prepared by the parties.

Since 1907 New Mexico has been one of those states which have adopted the permit system of prior appropriation to determine priority for use of water. 72–1–1 to 72–13–12, NMSA (1978). On most New Mexico sources of water all the rights to use reliably available natural water have been acquired. This is true of the Rio Grande drainage system in the state.

Albuquerque is a rapidly growing metropolitan city which meets its inhabitants' water needs by pumping from wells in the Rio Grande River Basin. Because of the hydrologic connection of the alluvial aquifer, any lowering of the water table caused by Albuquerque's pumping has a direct, although delayed, effect on the surface and underground water downstream on the Rio Grande. The long range predictions as to the population growth of Albuquerque and its water requirements to meet the needs of such growth show that by the late 1980's or early 1990's the effect of ground water diversion by the City on the Rio Grande will exceed its presently vested rights in the natural water. These vested rights amount to 18,700 acre feet annually.

The anticipated shortage of water available to Rio Grande appropriators was realized at an early date. To meet their needs, Albuquerque, Rio Grande Valley irrigators and the State of New Mexico convinced Congress that a need existed to build a system for importing more water into the Rio Grande valley. In 1966 Congress authorized the San Juan-Chama Project for "municipal, domestic and industrial uses, and for providing recreation and fish and wildlife benefits." 43 U.S.C. 615 *et seq.* (1976).

The plan was carried out on a smaller scale than was originally planned. As its share, Albuquerque contracted to receive 17,700 acre feet of water per year through 1981 as measured at the outlet of Heron Reservoir, and 48,200 acre feet per year thereafter. As required by reclamation law, the contract contains a further provision that the City has to repay the federal government with interest, the portion of the project construction costs allocated to the City's water supply, along with annual operation and maintenance charges. This requires the City to pay fifty annual installments of approximately one million dollars each, regardless of whether the contract water is actually utilized by the City. This sizeable overhead shows why the City wishes to take advantage of any use that is available so as to help offset the costs. The City's position is found on page 8 of the July 8, 1970 Report to the City Commission from the Albuquerque Resources Committee:

It should be stressed that the city's obligations under the diversion contract begins [sic] in 1972, regardless of whether or not the city can use the water. Under terms of the contract no water will be distributed unless it is put to beneficial use on this side of the divide. Under no circumstances should the city's water be allowed to flow down the Colorado to be used in other states.

At the time of the trial of this case seven other entities had contracted with the Secretary of the Interior for San Juan-Chama water, but Albuquerque will eventually be the largest user.

Starting in 1982 Albuquerque will be authorized to put to beneficial use 48,200 acre feet of project water annually. The basic facts which were found at the trial and supported by the evidence are that the City will not need for municipal use its full 48,200 acre feet until the year 2025, but, of course, will need steadily increasing yearly amounts until then. By its own projection, based on the difference between its needs and the amount authorized, Albuquerque, in effect, will have 1,121,900 acre feet of "excess" water. It is not argued that the City, or a lessee of the City's right, may not take delivery if it can put the water to beneficial use. It is the delivery of this "excess" for the use which the City proposes which is in dispute.

One of the big disputes is that the provisions of the contract between Albuquerque and the government shows that Albuquerque plans to run the excess water, that which it cannot use, into Elephant Butte Reservoir. If this water remains stored with the annual excess added to storage for the 40 years until it is needed by the city population, 93% of all the water stored will be lost to evaporation. The City contends, however, that the stored water will be put to several beneficial uses: present sales to beneficial users; exchanges with other beneficial users for return when the City's needs surpass the 48,200 acre feet; enhancement of power generation; municipal use; recreation. The City further argues that each of the planned uses is authorized by the San Juan-Chama Project Act and the plans do not require approval of the New Mexico State Engineer. But for the finding that recreation is a beneficial use, the trial court ruled against the City in all regards. We must consider and evaluate these contentions.

### I.

█ It generally can be said that state law governs the distribution of water from federal projects unless Congress expresses a different approach. *See California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978).[2] The Reclamation Act of 1902, 43 U.S.C. § 372, *et seq.,* (1976), which is incorporated into the San Juan-Chama Project Act, 43 U.S.C. §§ 615 and 620c (1976), specifies that "beneficial use shall be the basis, the measure, and the limit of the right," to use the project water. The concept of beneficial use expressed in language similar to that of the Reclamation Act is contained in New Mexico's permit system of prior appropriation, N.M.Const. Act XVI § 3; 72–1–2 NMSA (1978), and the determination of beneficial use is a question of fact. *State ex rel Reynolds v. Rio Rancho Estates, Inc.,* 95 N.M. 560, 624 P.2d 502 (1981). The state controls the use of water because it does not part with ownership; it only allows a usufructuary right to water. *Holguin v. Elephant Butte Irrigation District,* 91 N.M. 398, 575 P.2d 88 (1977); *State ex rel Bliss v. Dority,* 55 N.M. 12, 225 P.2d 1007 (1950), app. dismd. 341 U.S. 924, 71 S.Ct. 798, 95 L.Ed. 1356 (1951).

### *What is the Meaning of Beneficial Use in the Present Context?*

█ Although the term "beneficial use" is not defined either in the New Mexico Constitution or Statutes, there are certain very important requisites of beneficial use which have been established by the New Mexico courts. The first of these is maximum utilization. This was first announced in the case of *Kaiser Steel v. W. S. Ranch Co.,* 81 N.M. 414, 467 P.2d 986 (1970). Although that case involved a private party's condemnation rights, the New Mexico court stated: "Our entire state has only enough water to supply its most urgent needs. Water conservation and preservation is of utmost importance. Its utilization for maximum benefits is a requirement second to none, not only for progress but for survival." 467 P.2d at 982. Maximum utilization then is a fundamental requirement which prevents waste of water.

**2.** Part II of this opinion discusses in detail the extent to which federal law has overridden state law in this particular case.

In *State ex rel. Erickson v. McLean*, 62 N.M. 264, 308 P.2d 983 (1957), the court considered again its discussion of the prevention of waste of water. This arose in a case in which the state sought to stop the continuous and uncontrolled flow of an artesian well which had been going for a number of years. The defendant argued that he was using the water for irrigation of grass and stock watering. The court responded as follows:

> [I]t is important to observe that, no matter how early a person's priority of appropriation may be, he is not entitled to receive more water than is necessary for his actual use. An excessive diversion of water, through waste, cannot be regarded as a diversion to beneficial use within the meaning of the Constitution. Article 16, §§ 1, 2 and 3, and [N.M.S.A. 72–1–2 (1978)]. Water, in this state, is too scarce, and consequently too precious, to admit waste.
>
> . . . .
>
> . . . Water is too valuable to be wasted, either through an extravagant application for the purpose appointed or by waste by misapplication which can be avoided by the exercise of a reasonable degree of care to prevent loss, or loss of a volume which is greatly disproportionate to that actually consumed.
>
> . . . .
>
> . . . Whatever right one has, even in his own, is subject to that established principle that his use shall not be injurious to the rights of others, or of the general public. . . . Nor can an appropriator take more water than he can beneficially use.

308 P.2d 987–89.

Our first inquiry must be the adequacy of Albuquerque's plans for beneficial use judged in the light of the foregoing principles and the foregoing facts as well.

### Storage Looking To Future Sales

■ The City's first assertion is that it was error for the trial court to hold that the long period of storage for future municipal use in this case is unreasonable. They say storage for municipal use has always been recognized as necessary to beneficial use. *State ex rel State Engineer v. Crider*, 78 N.M. 312, 431 P.2d 45 (1967), *City and County of Denver v. Sheriff*, 105 Colo. 193, 96 P.2d 836 (1939). Albuquerque's eventual use of stored water for the municipality would not be direct but would involve heavier pumping by the city in exchange for release of water to appropriators downstream from Elephant Butte Reservoir. It was found by the trial court, that if the water was stored until then, there would be a loss of 93% to evaporation. If the loss figures are correct and the 1,121,900 acre feet which Albuquerque is claiming were stored, only 78,811 acre feet would remain, the rest would evaporate. If the City were to store less, by using some water for other purposes, there would be, in turn, less for future exchange. It is to be noted that there is no evidence that the City has agreements to deliver to others now water which it will exchange for other water in the future. There is no indication that the trial court was clearly erroneous in its factual finding that the storage of water for exchange is unreasonable under these circumstances and would not be considered as a beneficial use by New Mexico. *State v. Rio Rancho Estates, Inc.*, 95 N.M. 560, 624 P.2d 502 (1981); *State ex rel State Engineer v. Crider*, 78 N.M. 312, 431 P.2d 45 (1967).

■ The City contends further that it will be using the water beneficially through sales to other water users. Such a plan is certainly recognized as appropriate for the City. *Mathers v. Texaco, Inc.*, 77 N.M. 239, 421 P.2d 771 (1966); *Albuquerque Land and Irrigation Co. v. Gutierrez*, 10 N.M. 177, 61 P. 357 (1900), aff'd. 188 U.S. 545, 23 S.Ct. 338, 47 L.Ed. 588 (1903).[3] But Albuquerque's sales have been limited to about 700–800 acre feet annually. The Tribe argues

---

**3.** Of course, these beneficial uses would be under the same restrictions relating to the water's use as Albuquerque. *California v. United States*, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978); *Ivanhoe Irrigation District v. McCracken*, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958).

that this is due to the fact that irrigators cannot afford Albuquerque's water; Albuquerque must pay 63% of the cost of building the project whereas agricultural appropriators contracting directly with the Bureau will pay only 9.8% of the cost for nearly equal amounts of water going to each. Whether this economic reason is true or not is irrelevant here where the issue is whether the water is being put to beneficial use. Albuquerque could sell the water at a loss or even give it away without depriving it of its character as a beneficial use. We do not deny that Albuquerque could take the quantity authorized in order to provide its purchasers for beneficial use regardless of the economic results to the City. But it cannot take the water now with a mere hope of possible sales in the future, most of which sales are yet to materialize. *Colorado River Water Conservation District v. Vidler Tunnel Water Co.*, Colo., 594 P.2d 566 (1979); *Carlsbad Irrigation District v. Ford*, 46 N.M. 335, 128 P.2d 1047 (1942).

■ The United States argues that the City has a reasonable time to develop use for the water and to thus perfect its appropriation. This right, however, is not unlimited. The City cannot divert the water which looks to future negotiation for various beneficial uses. *Colorado River Water Conservation District v. Vidler Tunnel Water Co., supra.* The reasonable time for development, 72–5–6 and 72–5–28(C), NMSA (1978), relates back to the date of showing an intent to appropriate by acquiring a permit. Until the City can apply the water it cannot be said to have a beneficial use, nor, for that matter, a completed appropriation. *State ex rel State Engineer v. Crider*, 78 N.M. 312, 481 P.2d 45 (1967); *State ex rel. Reynolds v. Mendenhall*, 68 N.M. 467, 362 P.2d 998 (1961).

■ In sum, it is essential that there shall have been a beneficial use which is more than speculative. The Bureau cannot deliver the water to the City under a plan which is nothing more than speculative with respect to the beneficial uses.

*Storage Looking to Added Power Generation*

■ The next argument of the City is that it has a beneficial use because its storage of the water in Elephant Butte Reservoir will increase the head of water available for electric power generation, thereby increasing the output for an unchanged amount of water passing through the turbines. The United States, the owner of the generating plant, seems to be willing to credit the City up to its annual 10 cent per acre foot Elephant Butte Reservoir storage fee from any revenues from power generation, which Albuquerque argues is a benefit to the City. The fact that the storage of water will, in effect, be free has absolutely no bearing on the determination of beneficial use. As noted above, neither economics nor storage is relevant to the beneficial use concept. The beneficial use under these circumstances is the generation of power for which the storage is allegedly necessary, but the use would be for the benefit of the United States rather than for Albuquerque.

■ The record reveals that based on increasing the pool at Elephant Butte by 200,000 acre feet, power output will increase 16 kilowatts per acre foot in the summer, and 14.3 kilowatts per acre foot in the winter.[4] With an addition of 400,000 acre feet the increase would be 27.5 kilowatts per acre foot and 24.6 kilowatts per acre foot, respectively. Even if all of Albuquerque's water were to be diverted to the reservoir it would not bring the pool above 400,000 acre feet, and, due to evaporation, such a level would be maintainable only for a relatively short time. Two hundred thousand acre feet would be a more realistic amount and could be maintained for the entire 45 years. These pool sizes, however, fail to solve the problem. There remains the 93% loss of the water stored, and the result is generation of relatively small amounts of power. *State ex rel. Erickson v. McLean*, 62 N.M. 264, 308 P.2d 983 (1957).

4. Solely for purposes of putting this fact into common understanding, the power generated by the plant will, if it is all sold, increase revenues by only $86,000 per year.

This fact, coupled with the trial court's findings that there was no evidence of any contracts, negotiations, or plans to sell the increased output of electricity, is adequate support for the trial court's determination that power generation is too wasteful and speculative to constitute a beneficial use [5] under the state law.

### To What Extent, if Any, is Recreation to be Regarded as a Beneficial Use?

The final point that the City has made is that the trial court was correct in finding that recreation is a beneficial use under New Mexico law. For this proposition both Albuquerque and the trial court rely on *State ex rel. State Game Commission v. Red River Valley Company*, 51 N.M. 207, 182 P.2d 421 (1945). That case reveals that the beneficial use being considered—fishing and boating—was relative to unappropriated public waters of the State of New Mexico. Even though the water in question was flooded behind a dam, the New Mexico Supreme Court referred to it several times in the course of the opinion as unappropriated. Nowhere in the opinion does the court hold that water may be validly appropriated for a recreational use, nor have the New Mexico courts cited the case for such a proposition. In fact, it does not appear that New Mexico has been faced with the question. However, in *Mimbres Valley Irrigation Co. v. Salopek*, 90 N.M. 410, 564 P.2d 615, 619, *affirmed, U. S. v. New Mexico*, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978), while it does not commit itself, the court hints that it would give such a question serious consideration.

The issue before us as to whether water may be appropriated for recreation was not cross appealed. This fact causes difficulty in ruling on the issue. It is, of course, poor policy to rule on issues which are not properly before us. This question is resolved under federal law and this is discussed in detail in part II.

■ The City along these same lines contends that because many Albuquerque residents use the Elephant Butte Reservoir for recreation, and can be expected to continue to use it, that the filling of the reservoir with San Juan-Chama water should be deemed as a municipal use, since such a use can be authorized by Congress. But merely changing the name of the plan does not alter the overwhelmingly obvious and undisputed fact that the water is intended to be used by Albuquerque for recreation. It does not follow from the fact that Albuquerque is a municipality that every use to which it puts the water thereby becomes a municipal use. The Congressional limitations on beneficial use cannot so easily be avoided. They must be considered and dealt with. *California v. United States*, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978); *Ivanhoe Irrigation District v. McCracken*, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958).

### II

### Consideration of Storage of Water for Recreation Purposes Under Federal Law

■ We have concluded that storage of water by Albuquerque in Elephant Butte Reservoir for the purposes of eventual resale, electrical power and provision for municipal needs does not constitute beneficial use under New Mexico law, and as discussed more fully below, the requirements of state law govern the distribution of water from federal reclamation projects unless specifically overridden by congressional mandate or directives. Nothing in the statutes nor the legislative history indicates that Congress intended to authorize uses of water otherwise prohibited under state law. Because it is questionable under New Mexico state law, and unnecessary to the resolution of this law suit, we have not ruled on the question of whether the storage of water in Elephant Butte Reservoir solely

---

5. Under other circumstances, power generation most certainly can be a beneficial use of water in many states and, we assume, also in New Mexico. *Moore v. California Oregon Power Co.*, 22 Cal.2d 725, 140 P.2d 798 (1943); *City of Lodi v. East Bay Municipal Utility District*, 7 Cal.2d 316, 60 P.2d 439 (1936); *In re Hood River*, 114 Or. 112, 227 P. 1065 (1924).

for the purposes of recreation would constitute a beneficial use. We are satisfied, however, that such use of San Juan-Chama water by Albuquerque even if recognized as beneficial under state law would be at odds with the federal statutes authorizing the San Juan-Chama project.

### A. Applicable Federal Law—Acts of Congress and Decisions.

The history of the Federal Reclamation Law, and especially the Reclamation Act of 1902 and subsequent supplemental legislation, need not be repeated here. See, *California v. United States*, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978).

The remaining problem in this case is ascertainment of the proper functions of state and federal law as applied to the distribution of San Juan-Chama water. Section 8 of the 1902 Act, 43 U.S.C. § 383 provides in pertinent part:

Nothing in * * * this title shall be construed as affecting or intended to affect or to in any way interfere with the laws of any state or territory relating to the control, appropriation, use or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of such sections, shall proceed in conformity with such laws * * *.

The extent to which the Bureau of Reclamation is required by § 8 to defer to state law in administering reclamation projects has been considered on several occasions by the Supreme Court. Some of the earlier cases suggested that the United States was required to defer to state law only on the question of what water rights must be compensated for in the event that a federal reclamation project interfered with previously existing uses of water. *City of Fresno v. State of California*, 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963); *Dugan v. Rank*, 372 U.S. 609 (1963); *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950). Federal law generally controlled distribution of reclamation project water. *State of Arizona v. State of California*, 373 U.S. 546, 589, 83 S.Ct. 1468, 1492, 10 L.Ed.2d 542 (1963); *Ivanhoe Irrigation District v. McCracken*, 357 U.S. 275, 291, 78 S.Ct. 1174, 1183, 2 L.Ed.2d 1313 (1958).

The above opinions have been modified and in some instances limited by the Supreme Court's decision in *California v. United States, supra.* In that case the Supreme Court found that under § 8, water rights needed for reclamation projects had to be acquired by the Secretary of the Interior in strict conformity with state law. "Second, once the waters were released from the Dam, their distribution to individual landowners would again be controlled by state law." 438 U.S. at 665, 667, 98 S.Ct. at 2996. However, the Court indicated that "state water law does not control in the distribution of reclamation water *if* inconsistent with other congressional directives to the Secretary." 438 U.S. at 668, n. 21, 98 S.Ct. at 2997, n. 21. (Emphasis in original.)

### B. Storage for Future Use, Electrical Power or Resale

*California v. United States* holds that, in general, state law will govern distribution and use of water after release from a federal reclamation project. Section 8 of the 1902 Act further provides that "... beneficial use shall be the basis, the measure and the limit" of rights to use of water from reclamation projects. 43 U.S.C. § 372. In our view, it is clear that the Secretary of the Interior may not, consistent with the Reclamation Act, knowingly release water to an individual or entity for a use which is not recognized as beneficial under state law, unless such use is specifically authorized by a congressional directive. By the same token, no one is entitled to receive water for a use not recognized as beneficial under state law.

We concluded above in Part I that Albuquerque's arguments regarding beneficial use for electrical power, resale and storage for future use do not agree with the law of New Mexico on these subjects. While each of these uses is, indeed, recognized as beneficial under state law, the application of water to be stored in Elephant Butte Reser-

voir to any of these purposes is too remote or speculative to constitute a beneficial use. Accordingly, storage for such purpose is prohibited unless a specific congressional authorization for such use is to be found. The appellants concede that there is no such authorization of uses not recognized by state law in any of the relevant statutory provisions. Nor have we discovered any such statutory provision. Accordingly, we have to conclude that Albuquerque may not receive delivery of water for storage at Elephant Butte for any of these purposes under either state or federal law.

## C. *Storage for Recreational Use*

It was the trial court's conclusion that storage for recreational use can be classified from a technical standpoint as a beneficial use under the laws of the State of New Mexico. As noted previously, we are not as certain as the trial court that storage solely for recreational purposes can be considered a beneficial use under the laws of New Mexico, especially where so much of the stored water will be lost to evaporation, and will never be available for other beneficial uses. But assuming that such storage does indeed satisfy the requirements of New Mexico law, it is our view that the applicable federal statutes prohibit storage of San Juan-Chama water solely for recreational purposes, because it is out of harmony with the entire basic philosophy of this project, if for no other reason.

From the very beginning of the reclamation program, Congress has restricted the use of water released from reclamation projects. Section 8 of the 1902 Act, which has been referred to previously, provides that "the right to the use of water acquired under the provisions of this title shall be appurtenant to the lands irrigated, and beneficial use shall be the basis, the measure and the limit of the right." 43 U.S.C. § 372. Section 5 of the 1902 Act, 43 U.S.C. § 431, prohibits the sale of water to tracts of land in excess of 160 acres. These sections are exceptions to the general rule of § 8 that state law controls the appropriation, use or distribution of water. *California v. United*

*States, supra,* 668, n. 21, 98 S.Ct. 2997, n. 21; *Ivanhoe Irrigation District v. McCracken, supra.* Originally the federal reclamation laws made provision only for water to be used in irrigation; Section 8 itself states that state law governs appropriation, use or distribution *of water used in irrigation.*

The present law, as exemplified by 43 U.S.C. § 485h, authorizes the Secretary of the Interior to undertake projects for purposes other than the provision of water for irrigation. However, § 485h(c) states in part that "No contract relating to municipal water supply or miscellaneous purposes or to electric power or power privileges shall be made unless, in the judgment of the Secretary, it will not impair the efficiency of the project for irrigation purposes." In *City of Fresno v. State of California, supra,* the Supreme Court found that a state law giving priority to municipal water users was overridden by this provision. Thus, it is clear that Congress can and generally does restrict the uses to which water which is released from federal reclamation projects can be applied. From the early years of reclamation projects, state law has governed only as to use, allocation and distribution among water users seeking to utilize water for congressionally recognized purposes. In order to be able to determine whether storage of water for recreation is a recognized purpose in this case we must examine the statutes which authorize the San Juan-Chama project.

## D. *Federal Statutes*

The San Juan-Chama project is part of a comprehensive plan to develop the water resources of the states in the upper Colorado River Basin. The Colorado River Storage Project Act contains pertinent provisions:

In order to initiate the comprehensive development of the water resources of the upper Colorado River Basin, for the purposes, among others, of regulating the flow of the Colorado River, *storing water for beneficial consumptive use*, making it possible for the states of the Upper Basin to utilize, consistently with the provisions

of the Colorado River Compact, the apportionments made to and among them in the Colorado River Compact and the Upper Colorado River Basin Compact, respectively, providing for the reclamation of arid and semi-arid land, for the control of floods, and for the generation of hydroelectric power, as an incident of the foregoing purposes, the Secretary is authorized * * * to contract, operate and maintain the following * * * reclamation projects * * *: * * * San Juan-Chama (initial stage) * * *.

43 U.S.C. § 620 (emphasis added).

[T]he Secretary is authorized and directed to investigate, plan, construct, operate and maintain (1) public recreational facilities on lands withdrawn or acquired for the development of [the Colorado River Storage Project], * * * to provide for public use and enjoyment of the same and of the water areas created by these projects *by such means as are consistent with the primary purposes of said projects*; and (2) facilities to mitigate losses of and improve conditions for, the propagation of fish and wildlife.

43 U.S.C. § 620g (emphasis added).

Although these provisions are general, there is an expression of congressional intent evident: § 620 states that storage of water is to be only for beneficial consumptive use; storage solely for recreation fails to meet the guidelines. Of course, § 620 also recognizes flood control and generation of hydroelectric power, both of which require at least temporary storage. Section 620 leaves the recognized purposes open-ended by inclusion of the phrase "among others."

■ Section 620g provides that where water areas are created by participating projects in the Colorado River Storage Project, the Secretary should make such areas available for public recreation. Such recreational use must be consistent with the primary purposes of the participating project. It logically follows that recreation itself is not a primary purpose. Thus, water areas are not to be created for recreational purposes.

In 43 U.S.C. §§ 615ii and 615pp *et seq.*, Congress authorized construction of the initial stage of the San Juan-Chama project. The original studies and project proposals had called for diversion of 235,000 acre feet per year from the San Juan-Chama Basin to the Rio Grande Basin. But the initial stage calls for a more limited diversion of approximately 110,000 acre feet per year for a smaller number of intended users.

Section 615pp provides in part:

Pursuant to the provisions of sections 620–620o of this Title [the Colorado River Storage Project Act], the Secretary is authorized to construct, operate, and maintain the initial stage of the San Juan-Chama project, Colorado-New Mexico, *for the principal purposes of furnishing water supplies* to approximately thirty-nine thousand acres of land in the Cerro, Taos, Llano, and Pojoaque tributary irrigation units in the Rio Grande Basin and approximately eighty-one thousand six hundred acres of land in the existing Middle Rio Grande Conservancy District and for *municipal, domestic and industrial uses, and providing recreation and fish and wildlife benefits.* . . . (emphasis added)

■ From a reading of the above statute it is to be concluded that the principal uses of the San Juan-Chama water are to be municipal, domestic, industrial and irrigation. True, it expresses the intention that the water provide recreation and fish and wildlife benefits. It is plain, however, that such benefits are not intended to be primary purposes, but, rather, incidental ones.

■ The appellants argue that a contract purchaser of water may use such water for any purpose recognized as beneficial under state law. We, however, disagree with this. As discussed previously, Congress has placed limitations on permissible uses of project water and has established priorities among uses since the very inception of federal reclamation law. These directives are binding on the Secretary and on those seeking to obtain project

water. Where, as here, Congress has specified the uses to which project waters are to be put, a person entitled to receive water must apply that water to an authorized use.

### E. *Do the Studies and Reports Indicate That Recreational Purposes Are Authorized?*

 Based solely on the statutory language of § 615pp, it is to be concluded that storage of San Juan-Chama water solely for recreational purposes is not authorized. Appellants have argued, however, that the limitation on recreation, fish and wildlife is properly understood as a congressional effort to require reimbursement of project costs. Once water is delivered to a contract purchaser, they argue, Congress did not intend to prevent use for recreation and wildlife. Appellants further maintain that recreation is a municipal use, thus bringing storage for recreation within the principal purposes recognized by the Act. In order to adequately address these contentions, it is necessary to consider materials underlying the statutes which authorize the San Juan-Chama project.

43 U.S.C. § 615ii authorizes both the San Juan-Chama and Navajo Irrigation projects. That statute states:

> The Navajo Indian irrigation project and the initial stage of the San Juan-Chama project herein approved *are substantially those described in the proposed coordinated report* of the Acting Commissioner of Reclamation and the Commissioner of Indian Affairs, approved and adopted by the Secretary of the Interior on October 16, 1957, as conditioned, modified, and limited herein. (emphasis added)

The report referred to in the statute is brief but it incorporates and relies upon two previous reports issued by the Bureau of Reclamation. The October 1957 report does indicate that the entire 110,000 acre feet is to be allocated to irrigation and to the City of Albuquerque for municipal and industrial purposes. The report states that "The initial stage development does not provide for an allocation of water to fish and wildlife purposes," although modification of facilities and operations so as to preserve and propagate fish and wildlife is contemplated. Acting Commissioner of Reclamation and Commissioner of Indian Affairs, Proposed Coordinated Report, H.R.Doc. No. 424, 86th Cong., 2nd Sess. (1960). Ex.C. at xvii.

The October 1957 report states that the initial stage provides for additional recreational facilities in the Rio Grande Basin. The facilities are described as "minimum basic recreational facilities" at the project reservoirs, to be paid for by the federal government at a cost of approximately $400,000. The two earlier reports cited by the October 1957 report clearly state that "no water depletions would result from recreational development." Bureau of Reclamation, Supplemental Report on San Juan-Chama Project, H.R.Doc. No. 424, 86th Cong., 2nd Sess. (1960), Ex.C at 7, [hereinafter "May 1957 Report"]; United States Department of the Interior, Plan for Development of the San Juan-Chama Project, H.R.Doc. No. 424, 86th Cong., 2nd Sess. (1960), Ex.C at 8, [hereinafter "November 1955 Report."] Thus, the reports specifically referred to in the authorizing legislation remove all doubts as to recreation being incidental to uses of water for other purposes.

The appellants maintain that Congress did not directly allocate water for recreation or fish and wildlife, because, under 43 U.S.C. § 620g, a proportionate share of the project costs would then be non-reimbursable. In contrast, § 620e requires the Secretary to recover costs allocated to municipal water supply. From these two statutes, appellants infer that Congress did not intend to prevent contract purchasers of water from using purchased water for recreation or wildlife.

 Based then upon express provisions of the statutes quoted above, §§ 615ii and 615pp, and the statements found in the reports above, it must be concluded that the appellants infer much too much from the general reimbursement provisions of the Colorado River Storage Project Act. The reports and the history reveal a more compelling reason for the decision not to allo-

cate water to recreation or fish and wildlife. Congress has been told repeatedly that there is a critical shortage of water in the Rio Grande Basin, and that additional water is desperately needed for municipal, industrial and agricultural purposes. *See* May 1957 Report, Ex.C. at 3, 19, 59, 68, 128; H.R.Rep. No. 685, 87th Cong., 2nd Sess., *reprinted in* [1962] U.S.Code Cong. & Ad. News, 1681, 1685. Considering, then, the consistent concern, expressed repeatedly in discussions and studies underlying the San Juan-Chama Act, for the many critical needs for water in the Rio Grande Basin, we are unable to agree with appellants that the statutory language was designed to limit federal expenditures. Rather, the background materials show that the statutory language was deliberately intended to make recreation and fish and wildlife benefits incidental to other primary uses of the water.

A further argument by appellants is that recreational use, when provided by a city, is a municipal use of water. Thus, storage at Elephant Butte is authorized as one of the primary purposes of San Juan-Chama water. The City relies primarily in supporting this argument on state statutes authorizing municipalities to use and supply water outside city boundaries for "public use." § 3–27–1, NMSA (1978).

Whether or not recreation is a municipal use of water under state law is not relevant. Recreational use of this type was viewed as distinct from municipal use generally by Congress. Congress uses both terms in the statutes; each has a distinct meaning. The contract at issue here would allow Albuquerque to store over 48,000 acre feet a year, nearly half of the entire San Juan-Chama project diversion, in a reservoir some 150 miles from Albuquerque. We need not decide whether the city could, consistent with congressional intent, allocate a more modest amount of water to recreational use; the statutes clearly permit such use of water where incidental to other municipal purposes. The point is, though, that large scale allocations of San Juan-Chama water to strictly recreational

use was not intended to be included in the term "municipal" as used in the federal statutes. Such a substantial allocation would leave little for primary uses. Recreation, whether provided by Albuquerque or otherwise, could not justifiably constitute the only beneficial use of such a large amount of San Juan-Chama water.

F. *Does the Knowledge of the Congress That There is an Excess of Water Over and Above the Needs of Albuquerque Impliedly Authorize Albuquerque to Make Any Use of the Water Considered By it to be a Beneficial Use Under State Law?*

The studies preceding authorization of the project show that Albuquerque was expected to use its full allotment of water by 1990. *See* November 1955 Report, Ex. C at 28, 64. However, Albuquerque agreed to begin repayment of the project costs allocated to its municipal supply as soon as the project was complete. In return, Albuquerque requested that it be allowed to receive delivery of its full allotment for resale to others. The November 1955 Report, Ex. C. at 81 states:

> While the water supply studies assumed the demand would start at 6,000 acre feet annually about 1960 and increase uniformly over a 30-year period, the project plan provided for supplying the full amount of 50,000 acre feet annually whenever it is desired by the city. The plan contemplates that *the city would be permitted to resell the water for irrigation or other uses* during the interim period in which the city's demands are less than the supply being imported.

*See also*, November 1955 Report, Ex. C at 122; May 1957 Report, Ex. C at 16.

The language in all these reports indicates that the water was to be used by Albuquerque or resold to others in the Rio Grande Basin. This is entirely consistent with the reported shortages of water in the Rio Grande Basin; the initial stage of the San Juan-Chama project has provided for allocations of water to only some of the users reported to be in need in the Novem-

ber 1955 Report. November 1955 Report, Ex. C at 59, 68. The testimony at trial of Steve Reynolds, New Mexico State Engineer, also supports this view. Mr. Reynolds testified that Albuquerque contracted to repay project costs based on the understanding that the water could be used "in their own system or for resale to others *who would have the need for the water at that time.*" (emphasis supplied)

Following discussions between Albuquerque and the United States a contract was entered into for the delivery of water and the repayment of project costs. The original contract was dated June 25, 1963 and was amended July 6, 1965. It does contain some language which, if considered by itself, suggests that the city may do as it pleases with water from the San Juan-Chama Project:

> The city . . . shall have the exclusive right to use and dispose of that share of the project water supply available and allocated to municipal water supply purposes. . . . Water may be used or disposed of for any purpose desired by the city from time to time, either within or without the territorial limits of the city. . . . Ex. 11, pp. 11–12.

However, the contract also contemplates and provides for the possibility that the City might not use all of its water in a given year. The contract allows resale by the United States and credit to the city for amounts so collected.

■ Also, the contract cannot add to the basic statutory directive for the San Juan-Chama Project. The terms of the contract can be read as authorizing Albuquerque to dispose of the water for any purpose at all. Yet it is undisputed that the water has to be put to beneficial use, as required by law, and that this limits the City's discretion. There is no reason to find that other, more specific limitations on the authorized uses of the San Juan-Chama water should not also limit the City's rights under this contract. The Bureau of Reclamation cannot validly contract to deliver water on terms that are outside the authorization by Congress. 43 U.S.C. § 615ss(a). The statutes,

underlying reports and legislative history support the proposition that Albuquerque was to use its water allocation for municipal purposes, including resale to others in need of water so as to help defray the costs of the project.

■ The fact that Congress knew that Albuquerque might not require its full allocation immediately falls short of proving that Congress intended that the City should be free to do as it pleases with the excess water. It is true that Albuquerque was authorized to sell extra water, but resale must be made in a manner consistent with the Project Act. The contract alone cannot be a basis for storage of large portions of Project water solely for recreational use.

### G. *The Other Federal Statutes*

■ Finally there are some other federal statutes that ought to be mentioned here in trying to bring to the surface every item which might bear some relationship to the questions which we are considering. 43 U.S.C. § 390b and 16 U.S.C. § 460*l*–12. The United States argues that these two sections authorize storage of water at Elephant Butte reservoir. Section 390b recognizes the desirability of federal cooperation with state and local governments seeking to develop water supplies. Section 390b authorizes storage as a part of:

> any reservoir project surveyed, planned, constructed or to be planned, surveyed . . . . to impound water for present or anticipated future demand or need for municipal or industrial water, and the reasonable value thereof may be taken into account in estimating the economic value of the entire project. . . .

The statute also requires repayment of storage costs. *See, Save Our Invaluable Land (SOIL), Inc. v. Needham,* 542 F.2d 539 (10th Cir. 1976), *cert. denied,* 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977). There is nothing in the language of this statute to suggest that contracts may be entered into to store water solely for recreational purposes. Even if the statute is read to permit storage by a municipality for any purpose, the specific terms and limitations of the

San Juan-Chama Project Act override conflicting authority in § 390b.

16 U.S.C. § 460*l*–12 authorizes consideration of opportunities for recreation and wildlife enhancement. If a project can reasonably serve those purposes, it is to be operated accordingly. Assuming that this statute, passed in 1965, applies to San Juan-Chama water, there is nothing in the statute which authorizes storage solely for recreational purposes. The statute does not suggest that specific limitations on use of project water should be ignored in favor of recreation or wildlife. The San Juan-Chama legislation provided for accommodation of recreation and wildlife, including facilities at project reservoirs and allotment of water to Elephant Butte and Cochiti Reservoirs, discussed below. The section in question does not override the requirements of the Project Act.

In 1964, Congress authorized permanent storage at Cochiti Reservoir of 50,000 acre feet of San Juan-Chama water, plus annual additions sufficient to offset evaporation losses, for recreation, fish and wildlife purposes. P.L. 88–293, 78 Stat. 171. In 1974, Congress authorized release of water from Heron Reservoir to provide up to 50,000 acre feet at Elephant Butte. Up to 6,000 acre feet may also be released annually for 10 years to compensate for evaporation. P.L. 93–493, 88 Stat. 1498. Appellees have argued, and the district court agreed, that 88 Stat. 1498 demonstrates that no storage at Elephant Butte is permitted in the absence of express congressional authorization. Appellants, on the other hand, urge that 88 Stat. 1498 and 78 Stat. 171 were passed to permit release of unpurchased water, and that no implied restriction on utilization of water by contract purchasers can be drawn from these statutes.

We cannot agree that 88 Stat. 1498 and 78 Stat. 171 prohibit storage at Elephant Butte under all circumstances, and what we say is not to be construed as reaching this conclusion. We are of the view that storage at Elephant Butte for purposes which are congressionally authorized and which constitute beneficial uses

under state law would not violate the San Juan-Chama Project Act. It was necessary that 88 Stat. 1498 and 78 Stat. 171 be passed in order to provide authorization because water was to be released without a contract as required by 43 U.S.C. § 615ss, and for use for solely recreational purposes. We cannot infer from these statutes that water received by contract purchasers is not to be stored at Elephant Butte for municipal, industrial or irrigation purposes.

Finally, we consider a portion of the San Juan-Chama Project Act, 43 U.S.C. § 620a which provides:

[W]ith reference to the plans and specifications for San Juan-Chama project, the storage for control and regulation of water imported from the San Juan River shall (1) be limited to a single offstream dam and reservoir on a tributary of the Rio Chama, (2) be used solely for control and regulation and no power facilities shall be established, installed or operated thereat, and (3) be operated at all times by the Bureau of Reclamation of the Department of the Interior in strict compliance with the Rio Grande Compact as administered by the Rio Grande Commission. . . .

It has been argued by appellees that this prohibits storage of San Juan-Chama water anywhere besides Heron Reservoir. The total capacity of Heron Reservoir is apparently 400,000 acre feet. The Bureau of Reclamation requires contract purchasers to take delivery of their water allotments each year or forfeit the water for that year. At least under Albuquerque's contract, failure to take delivery does not relieve the city of the duty to make payment. Under appellees' interpretation, Albuquerque would in effect be prevented from storing any San Juan-Chama water. But we are satisfied that the narrow interpretation urged by appellees is not correct, and we do not rest our holding on this ground. The reports demonstrate that the purpose of § 620a was to prevent commingling of San Juan-Chama and Rio Grande Basin waters, and to permit

accurate measurement of the quantity of imported water. November 1955 Report, Ex.C at 51, 64, 71. The federal regulation and measurement facility was located on a small tributary stream primarily to protect the rights of downstream users to Rio Grande flows.

Other parts of the literature support the view that this limitation on federal facilities is not to be construed to prohibit storage of water by contract purchasers after delivery at the outlet of Heron Reservoir. 43 U.S.C. § 615pp suggests that in addition to the storage and regulation facility at Heron Reservoir, water use facilities were contemplated, including reservoirs and dams. *See also*, November 1955 Report, Ex. C at 69. The November 1955 Report considers the possibility of delivery of water allocated to the Middle Rio Grande Conservancy District at the district's El Vado Reservoir. Ex. C at 72. As part of the originally planned diversion of 235,000 acre feet per year, delivery of substantial quantities of water to Elephant Butte was anticipated. November 1955 Report, Ex. C at 65.

▮ The language of § 620a was not intended to prohibit storage of project water by contract purchasers after delivery. However, such storage must be pursuant to authorized uses of project water. We have expressed our viewpoint previously that relevant federal law does not prohibit storage so long as it is not solely for recreational purposes.

### III.

▮ The parties have considered the question of whether or not the United States must apply to the New Mexico State Engineer for a permit to store water in Elephant Butte. The United States is of course subject to the requirement of state law regarding distribution of water unless those requirements are inconsistent with applicable federal law. *United States v. California*, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978); *State ex rel. Reynolds v. Luna Irrigation Co.*, 80 N.M. 515, 458 P.2d 590 (1969).

The distribution of water is regulated in New Mexico through a permit system. §§ 72–5–1, NMSA (1978), *et seq.* In accordance with New Mexico law, the United States filed a Notice of Intention and an Application for Permit (Exs. P and Q). The application incorporates the November 1955 Report. These materials determine the scope of the permit. As a contract purchaser, Albuquerque is bound by the terms of the permit. § 72–5–33, NMSA (1978).

▮ The November 1955 Report and the permit do not authorize storage of large quantities of San Juan-Chama water by contract purchasers for purely recreational use. Nor can a permit authorize any use of water not recognized as beneficial under New Mexico Law. Thus, Albuquerque's present plans to store excess water at Elephant Butte are not authorized under the permit held by the United States.

\* \* \* \* \* \*

▮ On August 6, 1979 Albuquerque and the United States, acting through the Bureau of Reclamation, entered into a contract allowing the City to store part or all of its San Juan-Chama water in Elephant Butte Reservoir. Ex. 13. The appellants have argued that such storage would constitute a beneficial use under state law for several purposes: resale, future municipal use, electrical power and recreation. The evidence at trial demonstrated that under present circumstances storage at Elephant Butte would not result in beneficial use for resale, future municipal use or electrical power.

The contract between the City and the United States Bureau of Reclamation is, of course, entitled to some weight. However, to the extent that it is out of harmony with fundamental principles of water law in the state and is also at odds with the federal statutes, it is not possible to write an opinion upholding that contract in its entirety. The areas in which it does not pass muster have been emphasized.

We have assumed that storage for recreation at Elephant Butte could possibly be a beneficial use under New Mexico law. However, storage of large quantities of San Juan-Chama water solely for recreational use is not permissible under the federal statutes. Congress has given the Bureau of Reclamation and contract purchasers a good deal of discretion in utilizing San Juan-Chama water. But the authorizing legislation has been shown to establish that recreation and fish and wildlife benefits are to be incidental byproducts of the importation of San Juan-Chama water and that they are to be secondary to irrigation, municipal and industrial uses.

We conclude that neither the Bureau nor the City may store water in violation of congressional directives, especially in light of the fact that the storage would result in a great amount of waste due to evaporation.

It is for these reasons, therefore, that the judgment of the district court declaring the contract of August 6th, 1979 invalid, null and void is to be affirmed.

It is so ordered.