JOHN C. PORFILIO, Senior Circuit Judge.
The issue in this appeal is whether the Bureau of Reclamation (BOR) has discretion to reduce deliveries of available water under its contracts with irrigation districts and cities in New Mexico to comply with the Endangered Species Act, 16 U.S.C. §§ 1531-1544(ESA). Roiling beneath this question is an array of interests, many represented here. Each depends on water, “the liquid that descends from the clouds as rain, forms streams, lakes and seas, issues from the ground in springs, and is a major constituent of all living matter,” a definition mocked by the 2002 drought. Webster’s Third International Dictionary 2591 (Bd ed.1993). In a nar *1114 rowly drawn order addressing carefully limited circumstances, the district court held BOR has discretion to reduce contract deliveries and restrict diversions to meet its duties under the ESA. We agree and affirm that portion of the order that remains before us.
I. Endangered Species Act
The ESA, enacted in 1973, “represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation” by providing “a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved.” Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); 16 U.S.C. § 1531(b). Under Section 7, 16 U.S.C. § 1536(a)(2), every federal agency must insure that “any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of the endangered species or threatened species.” To do so, every federal agency is required to verify that its actions will not jeopardize any land-based listed species by consulting with, and obtaining the assistance of, the Secretary of Interior, acting through the Fish and Wildlife Service (FWS). 16 U.S.C. § 1536(4). Using “the best scientific and commercial data available,” 16 U.S.C. § 1536(a)(2), the agency must determine if any listed species may be present in the area affected by a proposed project and must confer with the Secretary whenever an action is likely to affect such a species. 16 U.S.C. § 1536(a)(3). Upon determining a species is endangered and listing it, the Secretary must designate critical habitat “on the basis of the best scientific and commercial data available,” 16 U.S.C. § 1533(b)(1)(A), and “make revisions ... after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat.” 16 U.S.C. § 1533(b)(2). Section 7, the Supreme Court has stated, “reveals a conscious decision by Congress to give endangered species priority over the ‘primary missions’ of federal agencies.” Hill, 437 U.S. at 185, 98 S.Ct. 2279.
Under the regulations accompanying an ESA listing, FWS is required to consult with the affected federal agencies, reviewing “all relevant information,” 50 C.F.R. § 402.14(g)(1), to formulate a Biological Opinion (BO), a comprehensive examination of “whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat.” 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.02. If the BO concludes “destruction or adverse modification,” 50 C.F.R. § 402.14(h)(3), FWS must “include reasonable and prudent alternatives, if any.” Id. If such a reasonable and prudent alternative (RPA) results in “an incidental taking” which the FWS considers “appropriate,” it must issue an Incidental Take Statement (ITS), immunizing the agency from prosecution under Section 9 of the ESA. 16 U.S.C. § 1536(o)(2), 50 C.F.R. § 402.14(i).
II. Parties in this Appeal
In the principal underlying amended complaint, non-profit environmental and conservation organizations, Defenders of Wildlife, Forest Guardians, National Audubon Society, New Mexico Audubon Council, Sierra Club, and Southwestern Environmental Center (Plaintiffs), on behalf of the Rio Grande silvery minnow (Hybogna-thus amaras) and the Southwestern willow flycatcher (Empisonax trailii extimus),[1] *1115 sued John W. Keys, III, Commissioner of the United States Bureau of Reclamation (BOR), the United States Army Corps of Engineers (Corps), and the United States Fish and Wildlife Service (FWS) (alternatively, Federal Defendants),[2] for actions alleged to jeopardize the silvery minnow. These federal agencies operate water diversion and storage facilities along the Middle Rio Grande, the New Mexico portion of the Rio Grande which extends from Velarde to the headwaters of the Elephant Butte Reservoir, north of Truth or Consequences, and includes the Rio Chama and Jemez River tributaries. After issuing its first order in that action on April 19, 2002 0Order I), the district court allowed intervention by the State of New Mexico (the State), the City of Albuquerque (the City), the Middle Rio Grande Conservancy District (MRGCD), and the Rio Chama Aceq-uia Association (RCAA) (collectively, Inter-venors). In their appeals of the court’s Order and Partial Final Judgment, Civ. No. 99-1320, September 23, 2002 (Order II), now before us under Fed.R.Civ.P. 54(b), numerous parties have submitted amicus curiae briefs.
III. History of this Litigation
Brinkmanship precipitated either through inadvertence or design best characterizes the history of the litigation now before us. Two lines of cases converge here, one targeting the survival of the silvery minnow in its critical habitat under the ESA, the other challenging the impact of that designation on New Mexico’s agricultural communities and burgeoning urban centers under the National Environmental Policy Act, 42 U.S.C. § 4321-70d (NEPA), which requires all federal agencies to examine the environmental impact of “major Federal actions significantly affecting the quality of the human environment.” 42 U.S.C. § 4332(2)(C). Although we only address the issues generated by the ESA action, our analysis resonates with issues raised by the NEPA litigation.
In the ESA litigation, we wrote in 1999, “[i]n 1991, the administrative process was set in motion to list the Rio Grande silvery minnow as an endangered species and designate its critical habitat.” Forest Guardians v. Babbitt, 174 F.3d 1178, 1181 (10th Cir.1999). Although FWS listed the Rio Grande silvery minnow in 1994, Final Rule, 59 Fed.Reg. at 36988 (July 20, 1994) (to be codified at 50 C.F.R. pt. 17), the Secretary of the Interior did not concurrently designate its critical habitat, 16 U.S.C. § 1533(a)(3)(A),[3] instead agreeing *1116 to do so by March 1, 1995, a deadline that he later asked to extend until October 1999, because of Congress' 13-month spending moratorium from April 1995 through April 1996. Because the duty to list critical habitat arose before Congress declared the moratorium and remained unfulfilled even two and a half years after the moratorium expired, we held the Secretary violated his non-discretionary duty by failing to publish a final critical habitat designation by March 1, 1995. Id. at 1193. Though reluctant to impose the deadline plaintiffs requested, we remanded the case with the instruction the district court order the Secretary to issue the critical habitat designation “as soon as possible, without regard to the Secretary’s other priorities under the ESA.” Id[4] In July 1999, eight years after the administrative process began, the Secretary designated 163 miles of the main stem of the Rio Grande, from Cochiti Dam to Elephant Butte Reservoir. See Final Designation, 64 Fed.Reg. at 36274-01 (July 6, 1999) (to be codified at 50 C.F.R. pt. 17).
This designation triggered a separate lawsuit by some of the parties here, who challenged its impact under NEPA and the ESA. In their consolidated action, MRGCD, the State, and environmental non-profits, Forest Guardians, Defenders of Wildlife, and Southwest Environmental Center, alleged FWS’ designation was arbitrary and capricious for faffing to adequately consider “to the fullest extent possible,” the economic and other relevant impacts under NEPA, 42 U.S.C. § 4332; and, respectively, to reflect the “best scientific and commercial data available” under the ESA, 16 U.S.C. § 1536(c)(1).
In Middle Rio Grande Conservancy Dist. v. Babbitt, 206 F.Supp.2d 1156, 1170 (D.N.M.2000), the district court agreed the designation of the entire 163 miles of the Middle Rio Grande without adequate consideration of “the best scientific data available” or the “economic impact, and any other relevant impact” was invalid. Under ESA scrutiny,- the court faulted FWS’ failure to support the Final Rule on factual grounds; to scrutinize alternatives to the entire 163 miles of the Middle Rio Grande; “define with sufficient specificity what biological and physical features are essential to the survival of the silvery minnow;” and identify or justify the baseline used to determine impact. Id. at 1178-79. On NEPA grounds, the court rejected FWS’ submission of a preliminary Environmental Assessment (EA), rather than the more detailed Environmental Impact Statement (EIS).[5] The court stated, “FWS’ designation of critical habitat ignores completely the most basic reality of the Rio. Grande: it is a fully appropriated river system. Rights to all of the river’s surface water are legally held for a variety of beneficial uses.” Id. at 1179 (emphasis im original). Indeed, FWS ignored “the probability of a vast shift in New Mexico’s economy, culture, ecology and social life as wholly unremarkable.” Id. at 1180.
In crafting relief at that time, the district court underscored, the “urgency of *1117 the situation and the complexity of the many interests to be reconciled require Defendants to do more than prepare an Environmental Impact Statement and issue a new final rule. Both the future of the Rio Grande silver [sic] minnow and the Middle Rio Grande Valley stand at imminent risk.” Id. at 1193 (emphasis added). The court left the designation of critical habitat in place, however, while ordering FWS to issue a new rule to take effect within 120 days, ordered the Secretary to prepare an EIS, and urged his federal representatives to “fully and earnestly participate in mediation now being conducted” in a parallel action. Id. at 1193.
Although FWS proposed a new critical habitat designation on June 6, 2002, see Designation of Critical Habitat for the Rio Grande Silvery minnow, 67 Fed.Reg. 39206 (June 6, 2002) (to be codified at 50 C.F.R. pt. 17), the Secretary did not conduct an EIS, instead, appealing that portion of the court’s injunction to allow FWS to reconsider whether an EIS was necessary. In Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220, 1225 (10th Cir.2002), we rejected this argument, recalling that “FWS’ compliance with NEPA and the ESA has been marked by massive delays and inadequate decision-making,” which fully exacerbated the status of the Rio Grande silvery minnow. Id. at 1226. “These delays and irrational decisions come at the expense of the Silvery Minnow, officially endangered for nearly eight years. As FWS recognizes, damming, channelization, and the introduction of nonnative predatory fish have decimated the Silvery Minnow population [which] currently occupies only five percent of its historic range.” Id. We agreed that preparation of an EIS was essential given the “overwhelming evidence that the designation will significantly affect the quality of the human environment .'.. [and] require pervasive changes in the distribution of Middle Rio Grande riverwater resulting in the reduction of irrigated agriculture acreage.” Id. at 1227.
What “significantly” affects impact under NEPA includes a determination of “the degree to which the effect ... will be ‘highly controversial’ ” Id. at 1229; 40 C.F.R. § 1508.27(b)(4). Because the record fully established “the effects of water reallocation and curtailment of river maintenance are significant” and “controversial,” id. at 1229, we instructed FWS and the federal agencies, especially BOR, responsible for managing and operating the dams, reservoirs and other projects slicing this span of the Middle Rio Grande, to insure “any action” proposed is “not likely to jeopardize the continued existence of any endangered species,” 16 U.S.C. § 1536(a)(2), a duty, we warned, which might require reallocating the already fully appropriated waters of the Rio Grande. Id. at 1230.
In the meantime, in April 2000, Plaintiffs, here, sought a preliminary injunction to compel BOR and the Corps to initiate consultations with FWS to implement their discretionary alternatives to maintain sufficient flows in the Middle Rio Grande to avoid jeopardy to the silvery minnow based on FWS’ initial studies.[6] On July 6, 2000, FWS initiated formal consultation with BOR and the Corps. Their consultations produced a final BO, on June 29, 2001, which found BOR’s proposed actions in operating the federal water projects on the Middle Rio Grande would result in *1118 jeopardy to the silvery minnow. Plaintiffs then filed a second amended complaint adding Federal Defendants, FWS, the Secretary of the Interior, and the United States seeking review of the June 29, 2001 BO under the Administrative Procedures Act, 5 U.S.C. § 701 et seq. (APA), and alleging FWS violated the APA by issuing the BO without a reasonable and prudent alternative and failing to- use the best scientific data as required by the ESA. Additionally, Plaintiffs alleged BOR and the Corps violated the ESA’s procedural and substantive requirements by failing to consult fully with FWS over all their discretionary actions and by causing jeopardy and an unlawful taking of the silvery minnows under Section 7(a)(1) and Section 9 the ESA’s substantive provisions.
In Order I, the district court upheld the June 29, 2002 BO after a comprehensive review of the ESA’s procedural and substantive provisions and the plight of the Rio Grande silvery minnow. In its APA review, the court found the reasonable and prudent alternative, though permitting some intermittent drying of the river in the San Acacia reach, was not arbitrary and capricious. On Plaintiffs’ consultation claim alleging BOR and the Corps have a duty to protect the silvery minnow more broadly, respectively, by limiting water deliveries under the Middle Rio Grande Project (MRGP) and the San Juan-Chama Project (SJCP) and altering the normal operations of Middle Rio Grande reservoir facilities, the court held, “BOR retains sufficient discretion over its river management and operations in the middle Rio Grande, specifically water deliveries under the Middle Rio Grande Project and under the San Juan-Chama Project, to require BOR to consult over those actions under Section 7(a)(2) of the ESA.” That conclusion derived from the ESA definition of “agency action,” which broadly embraced “any action authorized, funded, or carried out by such agency.” 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02 (emphasis added). In resolving this “more hotly contested issue, federal agency discretion,” the court looked both to the authorizing statute, the Reclamation Act, 43 U.S.C. § 372, the contracts governing BOR’s allocations of water, and case law, in particular a trio of Ninth Circuit cases. Although the court found procedural violations of the consultation requirement in FWS’ failure to expand the scope of consultation in a meaningful way by relying on BOR’s own interpretation of its discretion, it credited FWS’ “interim solution to avoid jeopardy in coordination with all the major players in the middle Rio Grande basin.” Order I at 44. This solution, it remarked, was achieved after “unprecedented attempts to come to grips with all the competing interests for a very limited water supply in the middle Rio Grande basin.” Id. Recognizing the circumstances were “complex, difficult to resolve, and evolving,” the district court applauded the Federal Defendants for protecting the silvery minnow “without altering water deliveries to federal contractors.” Id. at 44 (emphasis added).[7]
*1119 Five months later, piqued by BOR’s failure to reinitiate consultations while delivering “nearly all” contracted water despite the severe drought in 2002, the district court chastised the Federal Defendants for asking it to uphold a jeopardy determination with no reasonable and prudent alternative. Order II at 2. Because only the Endangered Species Committee, popularly styled the “God Squad” under an.amendment to the ESA, 16 U.S.C. § 1536(e),[8] may grant the exemption the Federal Defendants sought, the district court proceeded to address the substantive ESA issues raised by FWS’ September 12, 2002 BO. The court found the best scientific data available consistently indicated the San Acacia reach of the Middle Rio Grande provided the surest possibility for the silvery minnow’s survival. Nonetheless, the BO proposed targeting flows to the Albuquerque reach where the Silvery Minnow was already scarce. The court, thus, held the BO was arbitrary.and capricious under the ESA’s jeopardy and take provisions.[9] The court recognized delivering the same amount of contract water in 2003 would assure the Federal Defendants could not even meet the flow requirements set in the June 29, 2001 BO.
Tipping the balance of hardships and public interest in favor of the protected species, as required by Hill, the court granted preliminary injunctive relief to Plaintiffs on their jeopardy, failure to conserve, and take claims. It further relieved BOR from compliance with the June 29, 2001 flow requirements; required BOR to (1) provide sufficient flows for the remainder of 2002, releasing water from “Heron Reservoir in 2002,” if necessary to meet the 50 cfs flow in the San Acacia reach, (2) comply with the conservation recommendations in the BO of June 29, 2001 and September 12, 2002, (3) reinitiate consultation to plan for “contingencies that may arise during the rest of 2002 and during 2003 based on the different amounts of water that may be available iii the Rio Grande basin,” and (4) beginning in January 1, 2003, comply with flow requirements in “the June 29, 2001 Biological Opinion until a new Biological Opinion is issued that contains a Reasonable and Prudent Alternative that avoids jeopardy, if possible.” Order II at 3. Finally, the court wrote in Paragraph 14:
If necessary to meet flow requirements in 2003, either under the June 29, 2001 Biological Opinion or under a new Biological Opinion resulting from reinitiation of consultation, the Bureau of Reclamation must reduce contract deliveries under the San Juan-Chama Project and/or the Middle Rio Grande Project, and/or must restrict diversions by Middle Rio Grande Conservancy District un *1120 der the Middle Rio Grande Project, consistent with the Bureau of Reclamation’s legal authority as determined in the Court’s April 19, 2002 Memorandum Opinion and Order.
(¶ 14) Order II at 3.
IY. Jurisdiction
Despite this protracted and elaborate prelude, the district court’s facilitating our review under Fed.R.Civ.P. 54(b), and the parties’ assertion of jurisdiction under 28 U.S.C. § 1291, we are constrained to question whether the water level in the Rio Grande makes the issue before us justicia-ble. That is, under ¶ 14,[10] the contingency of how much water is flowing through the main stem of the Rio Grande and whether that amount satisfies the flow requirements for 2003, set either by the June 29, 2001 BO or a new BO,[11] appears to erode our power to decide the issue certified for review. Does this case present an actual case or controversy, ripe for review, or are we, in fact, being asked for an advisory opinion? “The case or controversy requirement of Article III admonishes federal'courts to avoid ‘premature adjudication’ and to abstain from ‘entangling themselves in abstract disagreements.’” U.S. West, Inc. v. Tristani, 182 F.3d 1202, 1208 (10th Cir.1999), quoting Keyes v. Sch. Dist. No. 1, Denver, Colo., 119 F.3d 1437, 1443 (10th Cir.1997). Although Plaintiffs questioned whether this case is ripe for review while Federal Defendants and Intervenors urge a decision on the merits, we must first assure our jurisdiction. Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234-1240 (10th Cir.2001).
Ripeness is “peculiarly a question of timing.” Reg’l Rail Reorganization Act Cases, 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). While a focus on whether the issue is ripe for review is sufficient to support standing, ripeness asks whether, in fact, there “yet is any need for the court to act.” 13A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3532.1, p. 130 (1984). “A claim is not ripe for adjudication if it rests upon ‘contingent future events that may not occur as anticipated or indeed may not occur at all.’ ” Texas v. United States, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998), quoting Thomas v. Union Carbide Agric. Prod. Co., 473 U.S. 568, 580-81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (internal quotations omitted).
To decide whether to act under these uncertainties, courts take a functional approach, balancing the need for decision against the risks of decision. See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir.1995) (“The doctrine of ripeness is intended to forestall judicial determination of disputes until the controversy is presented in clear-cut and concrete form.”). The need side of the equation includes “the importance attached to the interests that may be injured, the extent of the anticipated injury, and the probability that the injury will occur.” 13A C. Wright, A. Miller, & E. Cooper, *1121 Federal Practice and Procedure § 3532.2, p. 146. The risks of deciding may include “the relationships of the federal judiciary with other branches of the federal government and with state institutions, the. need to conserve judicial resources, and the risk that premature decision may be proved unwise as facts are more fully developed.” Id. at 147. This equation may be expressed in terms of the “fitness of the issues for judicial decision and the hardship to the parties of withholding .court considerations.” Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).
Applying these factors to the case before us, we believe the balance tips in favor of appellate review. The importance of the interests at stake — the preservation of an endangered species, which “admits of no exception,” Hill, 437 U.S. at 173, and the federal agencies’ obligation to fulfil existing water contracts as well as the extent of the injury, extinction of the silvery minnow if the drought persists, unless available water is allocated, and the potential harm to water users — outweigh the risk of a premature decision. As detailed here, the factual record has been accumulated over the last twelve years. The only “facts” left to develop depend on snow pack and rain, uncertain future events whose effect will be better understood once the legal issue, presently fully developed and concrete, is resolved. “The issue presented in this case is purely legal, and will not be clarified by further factual development.” Thomas v. Union Carbide Agr. Products Co., 473 U.S. 568, 581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985).
Importantly, resolution of the purely legal question at the heart of this appeal may permit the parties to fully address the array of long-term planning and water management issues which lurk beneath the surface of each of the issues presented here. “Rather than asking, negatively, whether denying relief would impose hardship, courts will do well to ask, in a more positive vein, whether granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest.” State of R.I. v. Narragansett Indian Tribe, 19 F.3d 685, 693 (1st Cir.1994) (ripeness analysis under the Declaratory Judgment Act). Indeed, if the Federal Defendants have, in fact, reinitiated broader consultation, certainty about their discretion to reallocate water under the contracts would permit a fuller evaluation of the solutions each party seeks.
Moreover, if we dismiss this case on the basis of ripeness, we essentially wipe the slate clean leaving the parties to develop the merits anew. We, therefore, must tip the balance to conserve the already vast investment Of judicial and executive agency resources. Under all of these circumstances, “delay means hardship.” Shalala v. Ill. Council on Long Term Care, 529 U.S. 1, 12, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000).
Y. Authorizing Legislation and the Contracts
Although Plaintiffs filed the underlying action to prevent jeopardy by drying portions of the Rio Grande determined to be the critical habitat of the silvery minnow, the heart of this case devolves to the interpretation of contracts authorized by several statutes enacted to address river aggradation and flood and sediment control in the Colorado River Basin and Middle Rio Grande Valley. With the entire case before us in this interlocutory appeal, and the record fully developed, we review the contracts, statutes, and regulations de novo. Sierra Club v. Marsh, 816 F.2d *1122 1376, 1382 (9th Cir.1987) (citations omitted).
A. The San Juan-Chama Project
Two acts of Congress authorizing the two major water projects in the Middle Rio Grande overarch this action. In 1962, Congress enacted the San Juan Chama-Reclamation Project Act of June 13, 1962, Pub.L. No. 87-483 (76 Stat. 96) (SJCP Act), under the Colorado River Storage Project Act of April 11, 1956, 43 U.S.C. § 620.[12] Section 620g of the Colorado River Storage Project Act directed the Secretary of the Interior:
to investigate, plan, construct, operate, and maintain (1) public recreational facilities on lands withdrawn or acquired for the development of said project or of said participating projects, to conserve the scenery, the natural, historic, and archeologic objects, and the wildlife on said lands, and to provide for public use and enjoyment of the same and of the water areas created by these projects by such means as are consistent with the primary purposes of said projects; and (2) facilities to mitigate losses of, and improve conditions for, the propagation offish and wildlife.
43 U.S.C. § 620g (emphasis added). As anticipated by 43 U.S.C. § 620, which crafted the initial stage of the San Juan-Chama Project in 1956, the SJCP Act of 1962 directed the Secretary:
to construct, operate, and maintain the initial stage of the San Juan-Chama project, Colorado-New Mexico, for the principal purposes of furnishing water supplies ... in thé Rio Grande Basin and ... in the existing Middle Rio Grande Conservancy District and for municipal, domestic, and industrial uses, and providing recreation and fish and wildlife benefits.
Act of June 13, 1962, Pub.L. No. 87-483 (76 Stat. 96).
The legislation authorized construction of “diversion dams and conduits, storage and regulation facilities at the Heron Numbered 4 Reservoir site,”[13] the principal storage facility at issue here, and enlarging the already existing El Vado Dam. Congress charged the Secretary with operating the SJC Project “so that for the preservation of fish and aquatic life, the flow of the Navajo and Rio Blanco Rivers,” involved in the earlier project “shall not be depleted” below levels set in a 1955 BOR Report entitled, San Juan-Chama Project, Colorado-New Mexico. Section 8(f), Pub.L. No. 87-483 (76 Stat. 96). The 1962 SJCP Act capped Rio Grande diversions at 1,350,000 acre-feet (a.f.) of water for ten years and required the Secretary to operate the project under the terms of the *1123 Upper Colorado River Basin Compact,[14] consulting with the several river commissions and appropriate agencies of the United States, Colorado, New Mexico, Texas, and other project entities. Section 8(e), Pub.L. No. 87-483 (76 Stat. 96).
As envisioned, the SJC Project created a trans basin diversion from the Colorado River Basin to the Rio Grande Basin, taking water from the upper tributaries of the San Juan River, a tributary of the Colorado River, and transporting it through a tunnel under the Continental Divide to the Rio Chama, a major tributary of the Rio Grande. BOR stores the water in Heron Reservoir. Below Heron Reservoir on the Rio Chama is El Vado Reservoir.
1. BOR-SJC Project Contracts
Under this congressional authorization, the Secretary of the Interior, pursuant to the Federal Reclamation Laws, including the 1956 Colorado River Storage Act and 1962 SJCP Act, “all as amended or supplemented,” entered into a basic contract with the City of Albuquerque (City) on June 25, 1963, “for furnishing water for municipal, domestic, and industrial uses, and for other beneficial purposes;' for the purpose of obtaining, securing, and supplementing its water supply ... for municipal purposes.” (1963 Repayment Contract) (emphasis added).[15] The 1963 Repayment Contract was based on the initial stage of the SJC Project,[16] which promised to furnish an average of about 101,800 a.f.[17] of project water, defined as “water available for use through the project works,” at the outlet of the Heron Dam for diversion of the natural flows of the Rio Blanco, Little Navajo and Navajo Rivers; regulation and storage facilities at Heron Reservoir and enlargement of the existing El Vado Dam on the Rio Chama; and water use:
To provide the City of Albuquerque with additional water for municipal purposes; to provide supplemental water for irrigation of irrigable land in the Middle Rio Grande Conservancy District; to replace depletions in the Rio Grande Basin; and reservoirs; dams, canals, laterals, and drainage for furnishing a firm water supply to the land in the Cerro, Taos, Llano, and Pojoaque tributary irrigation units.
In return, the City agreed to repay the costs incurred by the United States for constructing the reservoir complex. The contract listed the repayment schedule in annual installments. Those sums, however, did not include “that portion of the *1124 annual operation and maintenance cost allocated to the fish and wildlife function.” 1963 Repayment Contract, § 7b.[18] The contract provided that title to all project works and facilities “shall remain in the United States until otherwise provided by Congress.” § 12.
Under “WATER RIGHTS — WATER SUPPLY GENERAL,” the 1963 Repayment Contract included a limitation for water shortages (Water Shortage Clause):
On account of drouth or other causes, there may occur at times during any year a shortage in the quantity of water available from the reservoir storage complex for use by the City pursuant to this contract. In no event shall any liability accrue against the United States or any of its officers or employees for any damage, direct or indirect, arising out of any such shortage.
§ 18b (emphasis added). The 1963 Repayment Contract gave the City “the exclusive right to use and dispose of that share of the project water supply available and allocated to municipal water supply purposes. Such use or disposal may be by diverting and applying such water directly from the Rio Grande stream system,” offsetting underground water withdrawals with project water. § 18d. “[U]pon completion of repayment of that portion of the City’s water supply costs ..., the City shall have a permanent right to the use of that portion of the project water supply allocated to its use herein.” § 18d. A subsection entitled, “Other Uses,” provided,
The project is authorized for furnishing water for irrigation and municipal uses[19] and for providing recreation and fish and wildlife benefits, and for other beneficial purposes.
§ 18h. The annual allotment of 101,800 a.f. of project water, “available water” was qualified,
During periods of scarcity when the actual available water supply may be less than the estimated firm yield, the City shall share in the available water supply in the ratio that allocations above bear to the estimated firm yield.
1963 Repayment Contract § 18j. When costs are totally reimbursed, the City secured a “vested right to renew said contract indefinitely ... so long as a water supply may be available and the City is current on its payments for water service.” 1963 Repayment Contract § 26.
An amendatory contract, executed on July 6, 1965, authorized by a subsequent Act of Congress of March 26, 1964, authorized the Secretary “to make water available for a permanent pool for fish and wildlife and recreation purposes at Cochiti Reservoir from the San Juan-Chama Project.” The court’s decision in Jicarilla Apache Tribe v. United States, 657 F.2d 1126, 1133 (10th Cir.1981), prompted the amendment. Under this contract, the City agreed to release a portion of its San Juan-Chama Project water for the Cochiti Reservoir.
Subsequent contracts between BOR and other New Mexico cities, towns, and water districts incorporated the essential terms *1125 of Albuquerque’s 1963 Repayment Contract, including the water shortage and available water clauses. Later contracts, for example, a 1990 contract between BOR and the town of Red River, New Mexico, contained additional provisions for compliance with NEPA and Title VI of the Civil Rights Act of 1964. The 1992 contract between the Secretary and the Jicarilla Apache Tribe for delivery of Navajo Reservoir Supply water from the SJC Project works at Heron Reservoir and the Tribe’s diverting water from the Navajo River on the Reservation provided for cooperation among the parties, including FWS, BOR, and the Bureau of Indian Affairs, in planning and construction projects, “as required by federal law, including, but not limited to, the Bald and Golden Eagle Protection Act, the Fish and Wildlife Coordination Act, the Endangered Species Act, the Clean Water Act, and the National Environmental Policy Act.”
B. The Middle Rio Grande Project
Congress approved the Middle Rio Grande Project (MRGP) under the Flood Control Acts of 1948 and 1960, 38 U.S.C. §§ 701s, 701f-2, respectively, for flood control and reclamation.[20] Besides improving and stabilizing the economy of the Middle Rio Grande Valley, the proposal sought to rescue and rehabilitate the Middle Rio Grande Conservancy District (MRGCD), organized with private capital in 1925 as a political subdivision of the State, but floundering by the late 1940s because of its “originally unsound basis of assessment of benefits.” A Plan for Development of the Middle Rio Grande Project, New Mexico, Report on the Potential Project Plan, drafted by the BOR, August 30, 1947 (MRGP Plan). To that end, the United States agreed to acquire the MRGCD’s obligations and cancel all indebtedness in exchange for MRGCD’s conveying and assigning “all of its property rights, including reservoirs, canals, dams, and flood-control works, together with its water rights, and including title and' ownership thereto ... such property so conveyed to the .United States shall be so held until Congress otherwise directs.” MRGP Plan. The MRGP Plan included “fish and wildlife features” and further provided:
In general, any contract between the district and the United States should be in pursuance of the Federal reclamation laws as modified by specific direction of the Congress in pursuance of the provisions of section 9(a) of the Reclamation Project Act of 1939 [43 U.S.C. § 485],
Envisioned as a comprehensive scheme developed through “coordinated studies by the Bureau of Reclamation and the Corps of Engineers,” the MRGP Plan designated BOR responsible for the El Vado Reservoir improvements, Rio Grande channel rectification operations, irrigation and project rehabilitation work, and drainage rehabilitation and extension work; and designated the Corps for construction of three dams and reservoirs, as well as levees for local flood protection. Middle Rio Grande Project, Letter from the Bureau of the Budget to the Secretary of the Interior, April 12, 1949. The MRGP Plan indicated that “[ajdditional development of fish and wildlife values, and recreation facilities is needed through the Middle Rio Grande Valley to satisfy the increasing demand by the large number of out-of-state visitors, together with the local demand for such facilities.” The proposal allocated $670,109 for recreation, fish and wildlife, and geological survey programs, considered to be non-reimbursable and as a part *1126 of the reservoir and channelization development.
1. MRGCD Contract
The September 24, 1951 contract between the United States and the MRGCD, written under the Reclamation Acts of 1902, 1948, and 1950 (1951 Repayment Contract), “and acts amendatory thereof and supplementary thereto,” incorporated a “comprehensive plan for the control of the Rio Grande” as detailed in the 1947 BOR Project Report. Central to its terms was the transfer of title to all MRGCD works, defined as:
those structures, reservoirs, ditches and canals now constructed and operated by the District and those to be constructed or rehabilitated under the terms of this contract for the storage, diversion and distribution of water for use in the District, and the drainage of lands, together with rights of way therefor and for operation thereof.
§ 8. The United States agreed to construct, rehabilitate, operate, and maintain the MRGC Project works in exchange for MRGCD’s payment of reimbursable construction, operation, and maintenance costs. The contract included a clause barring liability for water shortages:
Should there ever occur a shortage in the quantity of water which normally would be available through and by means of said project works constructed in connection therewith, in no event shall any liability accrue therefor against the United States, or any of its officers, agents, or employees for any damage direct or indirect arising therefrom and the payments to the United States provided for herein shall not be reduced because of any such claimed shortage or damage.
1953 Repayment Contract § 23. MRGCD agreed to assign its water filings in the El Vado Reservoir to the United States to be held “primarily for domestic, irrigation and municipal use” and “reserved to the United States ... seepage and return flows.” § 28. Further, the MRGCD “may ... contract for the disposal of a part of the project water supply for any use not detrimental to the primary uses herein specified.” Id.
The 1951 Repayment Contract provided that “[tjitle to all works constructed by the United States under this contract [is] vested in ... the United States until otherwise provided for by Congress, notwithstanding the transfer hereafter of any such works to the District for operation and maintenance.” § 29. Throughout, the contract preserved the status of Indian lands and water rights within the MRGCD.
Under the 1951 Repayment Contract, MRGCD granted all necessary easements to the works and structures of the MRGCD to the United States. In May 1963, “in consideration of the privileges derived from the repayment contract,” MRGCD conveyed to the United States and assigned its “rights, titles and interests in and to water rights” described in Permit No. 1690,[21] including “upwards of 1,872,000 a.f.” whose source was the Rio Grande, Rio Chama, and other tributaries, for “irrigation, power, and other beneficial uses.”
Subsequently amended in 1953, 1955, and 1956, these MRGCD Repayment Contracts were again amended on June 25, 1963, after enactment of the SJCP Act, to *1127 secure a supplemental supply of water from SJC Project water. Incorporating many of the terms in BOR-SJC Project contracts, this amendatory contract added the provisions allocating fish and wildlife costs to the United States unless “unusual circumstances” arose to “throw the allocation out of balance;” the Water Shortage Clause (“[o]n account of drouth and other causes”); the other uses clause authorizing project water “for irrigation and municipal uses, and providing recreation and fish and wildlife benefits.”
As a consequence of the contracts derived from these legislative authorizations, virtually all available SJC Project water is appropriated. MRGCD, as agent of the United States, operates all Project works except El Vado Dam, which BOR operates.
VI. BOR’s Discretion to Allocate Water Under the Contracts to Comply with § 7 of the ESA-02-2034.
BOR contends the Repayment Contracts [22] define their obligations under the ESA. Because the contracts do not expressly permit a reduction in deliveries of project water below their fixed amounts, BOR maintains it lacks discretion to comply with the ESA. BOR tethers this argument to 50 C.F.R. § 402.03, which states, “Section 7 and the requirements of this Part apply to all actions in which there is discretionary Federal involvement or control.” Consequently, BOR lacks authority under the ESA to short its negotiated water contracts. Under this view, the Water Shortage Clause “on account of drouth or other causes,” applies only to circumstances in which it is “impossible” to deliver the fixed contractual water, not to situations in which it creates the shortage for purposes of complying with the ESA. BOR contends the latter action clearly expands its existing authority, a proposition rejected by Am. Forest and Paper Ass’n v. U.S.E.P.A., 137 F.3d 291, 299 (5th Cir.1998) (“the ESA serves not as a font of new authority, but as something far more modest: a directive to agencies to channel their existing authority in a particular direction”); Platte River Whooping Crane Trust v. Fed. Energy Regulatory Comm’n, 962 F.2d 27, 34 (D.C.Cir.1992).
BOR relies on Sierra Club v. Babbitt, 65 F.3d 1502 (9th Cir.1995), both to support this argument and to contrast the contrary conclusions reached in O’Neill v. United States, 50 F.3d 677 (9th Cir.1995); Natural Res. Def. Council v. Houston, 146 F.3d 1118 (9th Cir.1998); and Klamath Water Users Protective Ass’n v. Patterson, 204 F.3d 1206 (9th Cir.1999). In Sierra Club, environmental plaintiffs sued the Secretary of the Interior to enjoin the construction of a logging road alleged to adversely impact the Northern spotted owl. 65 F.3d at 1502. The Ninth Circuit affirmed the denial of injunctive relief upon accepting the opinion of the Regional Solicitor for the Bureau of Land Management that there was no discretionary federal action to which section 7(a)(2) could apply, “based on the three specific limitations of the right-of-way agreement, the regulations, and the statute.” Id. at 1509-10. Under those specific circumstances, the court held, “Congress did not intend for section 7 to apply to an agreement finalized before passage of the ESA where the federal agency currently lacks the discretion to influence private activity for the benefit of the protected species.” Id. at 1511-12. Here, too, BOR asserts it retained no discretion “to change or ignore its contractual commitments” through ESA fiat expand *1128 ing its authority. See also Envtl. Protection Info. Center v. Simpson Timber Co., 255 F.3d 1073, (9th Cir.2001) (take permit for Northern spotted owl did not reserve discretion for FSW to act to protect Coho salmon and marbled mullet later listed as protected species).
Moreover, BOR contends because the MRGP Act did not mention the use of water for fish and wildlife and the SJC Project Plan expressly excluded this use in a later report,[23] using the already contractually committed water is not “consistent with the scope of the Federal agency’s legal authority” to constitute a reasonable and prudent alternative under the ESA. 50 C.F.R. § 402.02. A reasonable and prudent alternative must be within the agency’s authority, BOR insists; otherwise, it is an unreasonable expansion of agency authority under the ESA.
BOR distinguishes O’Neill, Houston, and Klamath, on the ground that subsequently enacted legislation, the Central Valley Project Improvement Act (CVPIA), expressly allocated project water for fish and wildlife. Thus, BOR maintains, the absence of similar, specific legislation here undermines their precedential value. Although BOR concedes, the “other causes” clause in O’Neill is virtually identical to the clause here and might also well refer to subsequent enactments of Congress like the ESA,[24] no specific later congressional act expressly altered its fixed contractual commitments. Under that circumstance, BOR contends O’Neill and its progeny did not reach the question whether the ESA imposes a mandatory duty to devote irrigation water to avoid jeopardy of an endangered species. Thus, BOR contends the precise issue before us is whether the shortage clause alone gives it discretion to reduce contract deliveries of project water to comply with the ESA.
We would not channel the inquiry so narrowly, particularly because its predicate is that BOR’s ESA obligations are fixed solely by the Repayment Contracts. Under the ESA and its regulations,
Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies.... Examples include, but are not limited to:
(c) the granting of licenses, contracts, leases.
50 C.F.R. § 402.02. We fully agree BOR’s negotiating and executing these contracts is “agency action.” Houston, 146 F.3d at 1126. Hence, the breadth of this plain language surely places the burden on BOR to show how, in carrying out the mandates of the reclamation laws through the Repayment Contracts, BOR intended to limit Congress’ sovereign authority to enact subsequent legislation that figures into the interpretation of these contracts.[25] The *1129 question before us, then, is whether the Repayment Contracts, a watershed of numerous congressional authorizations, reserve discretion for BOR to comply with the ESA.
“Federal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party.” United States v. Seckinger, 397 U.S. 203, 209-10, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); Howard v. Group Hosp. Serv., 739 F.2d 1508, 1510-11 (10th Cir.1984) (federal law controls when outcome of suit has direct effect on the United States). The Repayment Contracts expressly rooted their authorization in the federal reclamation laws, “all as amended or supplemented.”
Looked at as a whole, the Repayment Contracts established a specific repayment schedule for a calendar year, § 7a, and specified that although 5.6 % of the annual operation and maintenance costs are attributed to fish and wildlife, BOR alone would be obligated to pay those costs. § 7b. BOR expressly limited its liability in case of drought “or other causes” which might affect “the quantity of water available from the reservoir storage complex.” § 18b (emphasis added). The contracts recognized exchanges in project water for water from aquifers and the Rio Grande stream system, native water, § 18d, and that during periods of scarcity, when the “actual available water supply” is less than “firm yield,” the non-federal parties will share in that available water. § 18j. Importantly, the Repayment Contracts expressly included providing water for fish and wildlife as a-beneficial use.[26] These clauses, taken together, establish that BOR retained the discretion to determine the “available water” from which allocations would be made, allotments which, in times of scarcity, might be altered for “other causes,” the prevention of jeopardy to an endangered species. The terms of these negotiated contracts, properly read together, presume BOR’s discretion in their implementation.- Moreover, reading BOR’s discretion to manage and deliver “available water” out of the plain language of the - Repayment Contracts disconnects them from their congressional authorization.
. Thus, under ¶ H, after BOR made all of the 2002 contract deliveries of “available water,” and [if] the “actual available water,” § 18j, in 2003, is less than the estimated firm yield because of the drought, BOR has discretion under these negotiated contracts to determine the “available water” to allocate to Intervenors and to fulfill its obligationsi under the ESA.[27] Surely, BOR’s reinitiation of consultation with FWS would otherwise remain a futile act given the district court’s finding of substantive violations of the ESA.
This result is fully in fine with O’Neill, Houston, and Klamath, correctly relied upon by the district court. O’Neill turned on contract interpretation, as does this case. Addressing BOR’s argument that the language of the shortage clause is “broad and unambiguous and that short *1130 age stemming from mandatory compliance with ESA and CVPIA are shortages resulting from ‘any other causes,’ ” 50 F.3d at 682-83, the court stated, “ ‘[a]ny other causes’ is a catchall phrase that does not ‘explicitly’ include any particular causes.” Id. at 683 (emphasis in original). The court concluded, “the contract’s liability limitation is unambiguous and that an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of ‘any other concluded ‘D’[n]othing in the [ ] contract surrenders in ‘unmistakable terms’ Congress’s sovereign power to enact legislation. Rather, the contract was executed pursuant to the 1902 Reclamation Act and all acts amenda-tory or supplementary thereto.’” Id. at 686. There, as here, the “contract contemplates future changes in reclamation laws.” M[28]
In Houston, which involved water renewal contracts to be negotiated after passage of the ESA and the CVPIA, the water districts argued BOR lacked “discretion to alter the terms of the renewal contracts, particularly the quantity of water delivered.” 146 F.3d at 1125. The court rejected the Solicitor of the Interi- or’s conclusion he lacked “discretion to change the quantity of water delivered under the contracts because the districts have ‘a first right ... to a stated share, or quantity of the project’s available water supply.’ ” Id. at 1126. The court relied on O’Neill to recognize “the total amount of available project water could be reduced in order to comply with the ESA or state law.” Id. The Ninth Circuit concluded when negotiating the renewal contracts, BOR has discretion to alter the key terms and “may be able to reduce the amount of water available for sale if necessary to comply with ESA.” Id.
In Klamath, third-party water users sought to enforce water contracts with BOR as third-party beneficiaries entitled to enforce the existing terms of contracts negotiated in 1956. 204 F.3d at 1206. Holding the water users did not have any rights to enforce the contracts other than those of “incidental beneficiaries,” the court first observed that the contract “evince[d] the unmistakable intent that Reclamation controls the Dam ... and makes clear that the United States retains overall authority over decisions on use of Project waters.” Id. at 1213. The responsibilities of that status included, “the authority to direct Dam operations to comply with the ESA.” Id.
Although the CVPIA and the ESA figured into each of these cases, three general precepts emerge which underpin our conclusion here. First, under principles of contract interpretation, the plain, terms govern. Second, the contracts, written under the reclamation laws, and all “acts amendatory and supplementary thereto,” envision applying subsequent legislation in their interpretation. Finally, the- plain terms of the shortage clauses provide the basis for BOR’s retaining discretion to allocate available water to comply with the ESA. We therefore hold that the Repayment Contracts give BOR discretion to reduce contractual deliveries of available water to prevent extinction of the silvery minnow.
This conclusion not only fully reflects the terms of the Repayment Contracts but also the absence of any contractual provi *1131 sion specifying absolute amounts of water. Given the potential for fluctuation in the “actual available water” and “estimated firm yield,” as acknowledged by BOR, and the contracts’ recognition of the possible reductions in “available water,” BOR’s discretion to reduce contract deliveries for “other causes” to include its compliance with the ESA comports with the reality of performing the Repayment Contracts and is consonant with the analysis of United States v. Winstar Corp., 518 U.S. 889, 877, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).
VII. State of New Mexico — 02-2254
The New Mexico Attorney General, the Office of the State Engineer, and the New Mexico Interstate Stream Commission (collectively, the State), intervened to articulate collective interests arising from their control of the use of water in New Mexico. See N.M. Const, art. XVI,[29] § 2; N.M. Stat. Ann. §§ 72-1-1[30], 72-12-1.[31] As a signatory to the Rio Grande Compact, the Colorado River Compact, and the Upper Colorado River Basin Compact,[32] the State sought to protect its responsibility for allocating and administering its waters and fulfil its role as parens patriae. Alleging the district court’s order impairs its ability to supervise the appropriation and distribution of state waters, the State contends the court’s “seizing” water from Heron Reservoir irreparably harms its citizens. This error springs from the district court’s failure to recognize that SJC Project water is entirely imported from the Colorado River and has no effect on the flows of the Rio Grande. In the State’s view, the lack of native water causes the harm. Thus, the causal link between trans basin water from the SJC Project and jeopardy to the silvery minnow is missing. The question, then, is not “whether imported water, the diversion and use of which in no way harms the minnow” supports injunctive relief, but whether the ESA requires BOR to expand its consultation with FWS to include seizing water from contractors, an action BOR did not propose to take. The district court’s remedy, the State maintains, usurps BOR’s authority, misreads the ESA, and misinterprets the Repayment Contracts and the SJCP Act.
To support this position, the State offers its interpretation of the Repayment Contracts, bottomed on the view that Congress enacted the SJC Project “to provide sufficient water for human needs through times of drought.” Water for “municipal, *1132 domestic and industrial uses” is the principal purpose of the Project; recreation, fish and wildlife benefits are incidental to this goal. With these two tiers of beneficial use,[33] the contractual provisions on “drought and other causes” are merely boilerplate found routinely in BOR contracts and intended solely to protect the public purse in the event of “the lack of natural flows or unforeseen occurrences.”
The State’s argument rests on a mistaken reading of Jicarilla Apache Tribe v. United States, 657 F.2d 1126 (10th Cir.1981), which does not broadly stand for the proposition that using SJC Project water for recreation, fish and wildlife purposes is not beneficial under the SJCP Act and state law. In deciding whether the City of Albuquerque could divert solely for recreational purposes its “excess water,” most of which would evaporate in the planned reservoir storage, the court acknowledged, “[i]t generally can be said that state law governs the distribution of water from federal projects unless Congress expresses a different approach.” Id. at 1133. In New Mexico, an arid state, “[w]ater conservation and preservation [are] of utmost importance. Its utilization for maximum benefits is a requirement second to none, not only for progress but for survival.” Id. (citation omitted). Thus, absent a specific congressional authorization, “storage of [project] water is to be only for beneficial consumptive use.” Id. at 1139.[34] Evaporation of 93% of the stored water, then, was not a beneficial use sanctioned by the SJCP Act.
Diverting SJC Project water to prevent jeopardy to the silvery minnow is a beneficial use under New Mexico law and the SJCP Act. The SJCP Act includes use of project water for fish and wildlife as a beneficial use and does not distinguish between primary and incidental benefits. Moreover, this use is consistent with the Colorado River Compact of 1922 and the Upper Colorado River Basin Compact of 1948. The State is a signatory of both.
Thus, the State’s interpretation of the Repayment Contracts based on its understanding of the SJCP Act and the statutory scheme it incorporates is incorrect. The Repayment Contracts include the intent to “replace depletions in the Rio Grande Basin.” To that end, they permit contracting parties to divert and apply Project water directly from the Rio Grande or offset pumping underground water with Project water. § 18d. Indeed, the Middle Rio Grande irrigation and diversion system, as a practical matter, functions as an interconnected series of dams and reservoirs, transporting SJC Project water which may offset depletions caused by natural and man-made circumstances. The record fully documents this continuing practice, defeating the State’s contention that SJC Project water does not harm the silvery minnow. Further, no party contests the permanent effects of the opera *1133 tion of federal projects on the life of the Middle Rio Grande.
As we have noted, the SJCP Act clearly contemplates using Project water for fish and wildlife benefits. Under state law, such releases constitute a beneficial use. Indeed, the State’s ongoing efforts — the Conservation Water Agreement of 2001 between the State and the federal government to store and release up to 100,000 a.f. of Middle Rio Grande water over three years, convening the Middle Rio Grande Endangered Species Collaborative Work-group; and its record of participation in hatchery augmentation of the silvery minnow and efforts at habitat restoration— defy the fixed stance the State takes here to marginalize BOR’s obligations under the ESA.
Finally, we note the governor of New Mexico requested relief under the Reclamation States Emergency Drought Relief Act, 40 U.S.C. §§ 2201-2226. Under § 2212(d):
The Secretary may make water from Federal Reclamation projects and non-project water available on a nonreim-bursable basis for the purposes of protecting or restoring fish and wildlife resources, including mitigation losses, that occur as a result of drought conditions or the operation of a Federal Reclamation project during drought conditions. The Secretary may store and convey project and nonproject water for fish and wildlife purposes, and may provide conveyance of any such water for both State and Federal wildlife habitat and for habitat held in private ownership. The Secretary may make available water for these purposes outside the authorized project service area. Use of the Federal storage and conveyance facilities for these purposes shall be on a nonreimbursable basis.
Given the breadth of this legislation, the plain meaning of the ESA, and our interpretation of the Repayment Contracts, we reject the State’s characterization of the district court’s order. The remedy the district court crafted fully appreciates the State’s commitment to protecting its water resources and ensuring BOR’s duty under the ESA.
VIII. City of Albuquerque — 02-2267
The City contends reallocation of imported Colorado River Basin water to alleviate the effects of the drought on the silvery minnow exceeds BOR’s authority under the ESA.[35] The error, the City maintains, derives from the district court’s view the ESA overrides pre-existing contractual rights. Although the ESA contemplates BOR’s entering into contracts and granting leases constitute “action” under 50 C.F.R. § 402.02(c), these pre-ESA contracts cannot trigger expanded consultation duties unrelated to the express tenns of the contract. In its view, the fixed Repayment Contracts, essentially, are off-limits as a mechanism of any solution to ESA compliance. Because the ESA merely provides “directives” and does not represent any new grant of power, BOR cannot avoid jeopardy to the silvery minnow by acting outside of its agency authority. American Forest & Paper Ass’n v. EPA, 137 F.3d 291, 299 (5th Cir.1998); Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC, 962 F.2d 27, 34 (D.C.Cir.1992).
In support of this position, the City reminds that the United States owns no *1134 water rights under state law but holds only a duty to store water in Heron Reservoir for the beneficial use of SJC contractors. The absence of any rights to the water it diverts defeats BOR’s power to direct the use of the water it stores to protect endangered species. In contrast, the City asserts the Repayment Contract gives the City a “perpetual right” to use project water along with, “at the very least, an exclusive contractual right to its share of the water supply.” Given this right, the City contends the district court erred when it found, “[a]t most, the City has an inchoate expectation to receive the full amount of its 2003 contract deliveries during 2003 ... subject to factors that affect the amount of water available.”
The City misreads the Repayment Contracts as “perpetual contractual obligations” and “perpetual contracts” providing “perpetual and exclusive rights” to beneficial and consumptive use. The 1963 Repayment Contract states, “[ujpon the expiration of said term [until water supply costs payable by the City ... are paid in full], the City shall have a vested right to renew said contract indefinitely at appropriate annual service charges so long as a water supply may be available and the City is current on its payments for water service.” 1963 Repayment Contract § 26 (emphasis added). Indefinite, having no exact limits, cannot be read to mean continuing forever.
Rather, as we have discussed, the express terms of the 1963 Repayment Contract direct BOR to limit deliveries (liability for delivering the contractual share of water) for “drought or other causes;” to reallocate costs “[i]f unusual circumstances arise which throw the allocation out of balance,” which necessarily may include “fish and wildlife;” “to replace depletions in the Rio Grande Basin;” and to allocate proportionately “[d]uring periods of scarcity when the actual available water supply may be less than firm yield.” Although the Repayment Contract gives the City a “permanent right” to the use of its allocation of water when its repayment obligations are met, that right remains conditioned by these and other contractual terms. This view does not alter the City’s contractual rights but aligns them with the overall purposes of the Reclamation Acts, the SJC Project, and subsequent legislation.[36]
IX. Middle Rio Grande Conservancy District — 02-2255
The MRGCD extends 150 miles from the Cochiti Dam, south of the city of Santa Fe, to the Bosque del Apache National Wildlife Refuge, and encompasses 128,787 acres of irrigable lands, half of which are presently irrigated. The MRGCD includes six Indian pueblos, Albuquerque, and numerous towns and villages. Since its creation under the New Mexico Conservancy Act, N.M. Stat. Ann. §§ 73-14-1 to 73-14-5, the MRGCD has grown from its Albuquerque Chamber of Commerce and landowner roots to become a key participant in state water management.[37] Pres *1135 ently, of its 238,000 a.f. of water, MRGCD asserts that 217,000 a.f. are native or non-project water and 20,900 a.f. are SJC Project water.
This distinction between native and Project water permeates MRGCD’s version of the' federal government’s rehabilitating and operating the district’s irrigation and diversion works, its claim to title of all MRGCD works, and its contention BOR cannot excuse its curtailing private water rights based on its alleged obligations under the ESA. That version is an eddy of details which swallows the inescapable fact that MRGCD agreed to the federal government’s financial rescue, rebuilding, restoring, and expanding its irrigation storage and delivery capabilities, in exchange for the transfer of all MRGCD assets and repayment of the costs of the restoration. MRGCD also agreed to BOR’s management of project works. As foreseen by that agreement, MRGCD amended the 1951 Repayment Contract in 1963 to supplement its supply of native water with SJC Project water.
In 1974, BOR transferred to MRGCD the operation and maintenance of all its irrigation and drainage works except for El Vado Dam and Reservoir, San Acacia Diversion Dam, and other channelization and flood protection works operated by the Corps. In Order I, the district court found:
BOR owns El Vado Dam and Reservoir and is authorized by federal law and state permit to store native Rio Grande water there for MRGCD. BOR releases that water at MRGCD’s call as agreed by contract and authorized by the state permit. MRGCD operates the United States’ diversion dams to divert these native flows for MRGCD and Pueblo Indian use during the irrigation season.
Nonetheless, to fortify its substantive arguments here, MRGCD filed a cross claim to quiet title to MRG Project works under 28 U.S.C. § 2409a(b).[38] Correctly, the district court did not resolve the claim which will remain pending until the “conclusion of any appeal therefrom, and sixty days.” When it is properly before the district court, that claim will, no doubt, be resolved by reviewing the federal reclamation legislation authorizing the MRG Project and the 1951 Repayment Contract which provided:
Title to all works constructed by the United States under this contract and to all such works as are conveyed to the United States ... shall ... be and continue to be vested in the name of the United States until otherwise provided by Congress, notwithstanding the transfer hereafter of any such works to the District for operation and maintenance.
*1136 1951 Repayment Contract § 29 (emphasis added). The 1951 Repayment Contract assigned all of the MRGCD’s water filings to the United States. Not simply full repayment but also approval by Congress must predicate the reversion of title to the MRGCD under the MRG Project Act and 1951 Repayment Contract. Hence, under all of the circumstances, we presume title to the MRG Project works remains in the United States during the pendency of this litigation.
Absent the quiet title claim, our resolution of MRGCD’s appeal must remain focused on BOR’s obligations under the ESA as a consequence of its water resource development whether that water is native or imported.[39] That BOR neither owns nor holds rights to native waters, has no reservoirs on the Middle Rio Grande, or “has neither purchased nor appropriated any water for delivery to Middle Valley farmers,” is not determinative of BOR’s obligation to consult with FWS and comply with the ESA. BOR’s retaining authority to manage MRGCD and SJCP works triggers its ESA obligations. Klamath Water Users, 204 F.3d at 1213.[40]
Although MRGCD insists that BOR has neither an obligation nor a “right” to consult with FWS to issue a new Biological Opinion that contains a reasonable and prudent alternative that avoids jeopardy, we note another statutory foundation for the district court’s directive. The Fish and Wildlife Coordination Act (FWCA), was enacted August 12, 1958, before passage of the SJCP Act of 1961. Under 16 U.S.C. § 662(c), “Federal agencies authorized to construct or operate water-control projects are authorized to modify or add to the structures ... to accommodate the means and measures for such conservation of wildlife resources as an integral part of such projects.” Section 662(a) provides:
whenever the waters of any stream or other body of water are proposed or authorized to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever ... by any department or agency of the United States ..., department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, ... with a view to the conservation of wildlife resources by preventing loss of and damage to such resources as well as providing for the development and improvement thereof in connection with such water-resource development.
When MRGCD amended the 1951 Repayment Contract to acquire a supplemental supply of water from SJC Project water, it necessarily agreed to the reach of the FWCA as well as the panoply of recla *1137 mation laws recited in both contracts.[41] We further note, contrary to MRGCD’s contention, the central issue before us— whether BOR has discretion to reallocate water to comply with the ESA—is also adumbrated by the Reclamation States Emergency Drought Relief Act of 1991, 43 U.S.G. § 2201. Although MRGCD’s arguments rest on the premise its native water is separate, distinct, and entirely removed from the “federal” reservoirs and other project works, that water flows as a consequence of the original federal rescue of the conservancy district. In that process, as MRGCD has acknowledged, the wildlife habitat of the Middle Rio Grande channel has been degraded. Congress has directed the same federal agencies to alleviate that consequence under this array of legislation.
X. Rio Chama Acequia Association— 02-2295
An association of 27 acequias, irrigation ditches, the RCAA depends for its “very survival” upon the water in the Rio Cha-ma, a northern tributary of the Rio Grande.[42] Entirely privately owned by its members, the RCAA emphasizes none of its ditches are located on the Middle Rio Grande and no silvery minnow are found in any of its water sources, which are 100 miles north on the Rio Chama. RCAA distinguishes that the 1250 a.f. of SJC Project water stored at Abiquiu Reservoir provides “the only feasible means of irrigating land, used predominantly to grow crops such as alfalfa, which in turn feeds the owners’ livestock and other animals” in a cultural ecosystem now threatened by the silvery minnow’s critical habitat needs. RCAA offers that “Many different facets of life on the acequia are intertwined, and therefore, when one aspect of traditional life is removed, the entire system could potentially collapse.” Thus, the question for the RCAA is whether, having relied for centuries on their limited water rights, it will be permitted to survive. In ordering relief, RCAA maintains the district court failed to weigh the hardship to the RCAA, especially the irreparable economic loss subsistence farmers will suffer.
Many of the issues RCAA has raised have already been addressed or are now moot, for example, challenging the flow levels ordered for the duration of 2002. RCAA, however, contests the district court’s standard for granting Plaintiffs injunctive relief, contending that by affording endangered species the highest of priorities under Hill, it completely ignored “traditional equitable principles.”
Surely, Congress could not have spoken any more clearly, as Hill found in articulating the standard for injunctive relief under the ESA:
Concededly, this view of the Act will produce results requiring the sacrifice of the anticipated benefits of the [Tellico Dam] project and of many millions of dollars in public funds. But examination of the language, history, and structure of the legislation under review here indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities.
*1138 437 U.S. at 174, 98 S.Ct. 2279. Recognizing that loss of a species is irreversible and irretrievable, Hill assured, “[l]est there be any ambiguity as to the meaning of this statutory directive, the Act specifically defined ‘conserve’ as meaning ‘to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.’ ” Id. at 180, 98 S.Ct. 2279 (emphasis in original); see also, Strahan v. Coxe, 127 F.3d 155, 160 (1st Cir.1997); Nat’l Wildlife Fed’n v. Burlington Northern R.R., Inc., 23 F.3d 1508, 1511 (9th Cir.1994).
As the First Circuit noted in Water Keeper Alliance v. U.S. Dept. of Defense, 271 F.3d 21, 31 (1st Cir.2001), which RCAA recited for its contention the court applied the wrong standard, “[w]hat standard of review applies depends on the question being asked.” Here, the question before the district court was whether substantive provisions of the ESA were violated. The court properly applied Hill’s standard for granting preliminary relief under the ESA. The “enduring or permanent nature” of an environmental injury tips the balance. Catron County, 75 F.3d at 1440.
Further, in so concluding, we observe the record fully reflects the district court’s painstaking, patient, and persistent efforts to entertain and address the complex legal and equitable issues spawned by this litigation. Surely, as a resident of the community, the district judge fully appreciated the many equities each party presented.
Finally, RCAA, like other Intervenors, has challenged the district court’s statement, “[t]he Federal Government must compensate those, if any, whose contractual rights to water are reduced in order to meet the aforementioned [2002] flow requirements.” Although that portion of the court’s order is now moot, the issue of compensation will likely resurface with reallocations that may eventuate from BOR’s exercise of discretion. Clearly, that issue is not ripe for our review, and any further discussion here is unwarranted.
XI. Conclusion
Scientific literature likens the silvery minnow, to a canary in a coal mine, the “last-remaining endemic pelagic spawning minnow in the Rio Grande basin.” As its population has steadily declined and now rests on the brink of extinction since its listing in 1994, we echo Hill’s “concern over the risk that might lie in the loss of any endangered species.” 437 U.S. at 177, 98 S.Ct. 2279. “The institutionalization of that caution lies at the heart of [the ESA].” Id., citing the Report of the House Committee on Merchant Marine and Fisheries on H.R. 37 (emphasis in original). In so broadly legislating, Congress sought to recognize that endangered species provide “keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask.” Id. Like all parts of that puzzle, the silvery minnow provides a measure of the vitality of the Rio Grande ecosystem, a community that can thrive only when all of its myriad components — living and non-living — are in balance. All of the parties have admirably participated in sustaining the vitality of that system. In that process, BOR’s discretion in operating these federal projects will more properly effect its consultation responsibilities with FWS and its water management role. To that end, we conclude the district court properly held BOR has discretion to reduce deliveries of water under its contracts to comply with the ESA. We therefore AFFIRM.

. Both species were named parties in the original complaint. In its April 19, 2002 or *1115 der, the district court noted the Southwestern willow flycatcher, listed as an endangered species in 1995, had increased in overall numbers, prompting the parties to address solely the silvery minnow. Absent a contrary indication in these appeals, we similarly confine our discussion to the silvery minnow.

. In its unpublished April 19, 2002 order, the district court found the Corps did not have “sufficient discretion to bring operation' of these reservoir facilities under the consultation requirement of the ESA.” Environmental plaintiffs have not challenged that ruling. This appeal addresses the issues BOR has raised following the district court’s order.

. 16 U.S.C. § 1533(3)(A) states,
(3) The Secretary, by regulation promulgated in accordance with subsection (b) of this section and to the maximum extent prudent and determinable—
(A) shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and
Designating critical habitat has the same priority as listing. In Catron County Bd. of Comm’r v. U.S. Fish and Wildlife Service, 75 F.3d 1429, 1437 (10th Cir.1996), we explained, "ESA’s core purpose is to prevent the extinction of species by preserving and protecting the habitat upon which they depend from the intrusive activities of humans.”

. Center for Biological Diversity v. Norton, 163 F.Supp.2d 1297, 1300 (D.N.M.2001), also rejected the Secretary's financial predicament and suggested Congress recognize the problems it has created. “Until Congress does, tax dollars will be spent not on protecting species, but on fighting losing battle after losing battle in court.” Id.

. In the EA, FWS concluded the critical habitat designation would have no significant impact on the surrounding areas by relying, in part, on a Draft Economic Analysis for 1996, marking "the end of a decade of above normal runoff and several years of significant thunderstorm activity in the Middle Rio Grande Valley.” Middle Rio Grande Conservancy Dist. v. Babbitt, 206 F.Supp.2d 1156, 1179 (D.N.M.2000).

. In response, the court ordered mediation, and the parties negotiated an interim Agreed Order in which the City of Albuquerque, MRGCD, BOR, and the Corps released additional water to maintain a continuous flow in the Upper San Acacia reach from October 1 through October 31, 2000.

. In an unpublished order, Rio Grande Silvery Minnow v. Keys, III, 46 Fed.Appx. 929 (10th Cir.2002), we dismissed Federal Defendants’ appeal of this order for lack of interlocutory appellate jurisdiction and denied a motion for stay as moot. Further, we held that interve-nors, the same parties here, who alleged the order had adverse consequences for their interests in Rio Grande water could show no injury in fact and, thus, lacked standing. The court’s order requiring federal defendants to “consider use of intervenors’ water when they consult caused no 'concrete injury.' ” Id. 932. "[Ujnless and until consultation actually results in a decision to use their water — which may never happen — any ‘injury in fact' to their interests attributable to the district *1119 court's order” is entirely conjectural and inadequate to confer standing. Id.

. 16 U.S.C. § 1536(e) provides:
(e) Endangered Species Committee
(1) There is established a committee to be known as the Endangered Species Committee (hereinafter in this section referred to as the "Committee").
(2) The Committee shall review any application submitted to , it pursuant to this section and determine in accordance with subsection (h) of this section whether or not to grant an exemption from the requirements of subsection (a)(2) of this section for the action set forth in such application.

. In finding the BO arbitrary and capricious, the court also faulted BOR for taking no water from the Heron Reservoir in order to fully meet.its SJC Project and MRGCD water deliveries; crediting "unspecified weather predictions of long-term drought for 10-15 years ('BOR gives the benefit of doubt to dire drought prediction, not the Silvery Minnow' ”); and assuming the silvery minnow's survival only through artificial means despite the best scientific data to the contrary. Order II at 20.

. ¶ 14 remains the only justiciable issue before us, the cooler and wetter fall of 2002 having permitted BOR to meet the June 29, 2001 flow requirements for the remainder of 2002 as ordered by the district court. Moreover, on October 16, 2001, we granted a request for stay of the district court's order and expedited consideration of these appeals.

. FWS and BOR notified the court of their intention to issue a new BO on March 10, 2003, extended to March 17, 2003, addressing "the effects of the Bureau of Reclamation's water and river maintenance operations, the Army Corps of Engineers’ flood control operation, and related non-federal actions on the Middle Rio Grande in New Mexico.” Until its completion, the June 2001 BO remains in effect.

. The Colorado River Storage Project Act of April 11, 1956, 43 U.S.C. § 620, authorized the Secretary of the Interior to construct, operate, and maintain the Navajo Dam and Reservoir on the Middle Rio Grande “to initiate the comprehensive development of the water resources of the Upper Colorado River Basin, for the purposes, among others, of regulating the flow of the Colorado River, storing water for beneficial consumptive use, making it possible for the States of the upper Basin to utilize, consistently with the provisions of the Colorado River Compact, the apportionments ■ made to and among them....” 43 U.S.C. § 620. New Mexico, one of four states in the Upper Colorado River Basin, was a signatory to the Colorado River Compact of 1922 under which this statute was authorized.

. Only imported SJC Project water may be stored in Heron Reservoir. All native water is released to the river below Heron Dam and "is effectively bypassed through Heron Reservoir on a regular basis." Programmatic Biological Assessment of Reclamation's Discretionary Actions Related to Water Management on the Middle Rio Grande, New Mexico, January 2001.

. The Colorado River Compact of 1922 divided the Colorado River among seven states vying for its water. The Compact bisected the Colorado River into two basins, Colorado River Compact, Art. I, the states of the Upper Basin, Wyoming, Colorado, Utah, and New Mexico, which "naturally drain into the Colorado River System,” Art. 11(f)(g), and those of the Lower Basin, California, Nevada, and Arizona. Sharon P. Gross, The Galloway Project and the Colorado River Compacts, 25 Nat. Resources J. 935, 938 (1985).

. The contract also incorporated the Reclamation Act of June 17, 1902, 43 U.S.C. § 372, which provides:
Water right as appurtenant to land and extent of right
The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right.

. The contract defines the term, project, "shall mean the initial stage of the San Juan-Chama Project, Colorado-New Mexico, as authorized by the Act of Congress dated June 13, 1962 (76 Stat. 96).”

. In 1989, BOR reduced the Firm Yield from Heron Reservoir to 96,200 a.f./yr. An acre foot is the volume of water that would cover one acre to a depth of one foot.

. A condition precedent of this contract stated:
§ 9b
Other Repayment Contracts. The United States shall not be required to initiate construction until the Middle Rio Grande Conservancy District shall have executed a contract satisfactory to the Contracting Officer covering a share of the costs of the reservoir storage complex.

. The City contract has no comma after “uses." In contrast, MRGDC’s amendatory repayment contract for SJC Project water has a comma after "uses” in the same clause. Our interpretation of the contract is not altered by the difference.

. 33 U.S.C. §§ 701s and 701f-2 authorized appropriated funds to specific projects for flood control as Congress broadly declared-in 33 U.S.C. § 701a.

. File No. 1690 attached to the contract "is a permit to construct El Vado Dam and impound and maintain therein a maximum of 198,110 acre-feet of water for flood control and supplementing the rights of the Middle Rio Grande Conservancy District with water for 123,267 acres.”

. Because both the SJC Project and the amended MRGCD contracts incorporate similar repayment schemes and terms, we refer to the contracts at issue as Repayment Contracts.

. In support, the Federal Defendants quote a portion of the Report which provides no support for this broad statement in the face of the express statutory language.

. Indeed, in O’Neill v. United States, 50 F.3d 677 (9th Cir.1995), BOR argued " 'on account of errors in operation, drought, or any other causes’ ... is broad and unambiguous and that shortages stemming from mandatory compliance with ESA and CVPIA are shortages resulting from 'any other cause.' ” Id. at 682-83.

.It also activates scrutiny under the doctrine of unmistakable terms, which broadly states, "[c]ontractual arrangements remain subject to subsequent legislation of the presiding sovereign.” Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 147, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). United States v. Winstar Corp., 518 U.S. 839, 878, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), summarized the collective holding on unmistakability:
that a contract with a sovereign government will not be read to include an unstated term exempting the other contracting *1129 party from the application of a subsequent sovereign act (including an Act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power.
None of the parties addressed this doctrine;

. Jicarilla Apache Tribe v. United States, 657 F.2d 1126, 1133 (10th Cir.1981), looked to New Mexico law to define beneficial use, noting that water conservation and preservation are "of utmost importance,” and the prevention of "waste of water” figured prominently in state court discussions of the definition.

. Of course, how BOR exercises that discretion will be tied to the BO resulting from BOR and FWS’ reinitiating consultation.

. BOR excises only a portion of O'Neill’s quoting one of the parties' argument that "CVPIA marks a shift in reclamation law modifying the priority of water uses." 50 F.3d at 686. The court then stated, "There is nothing in the contract that precludes such a shift,” aligning it with the general principles of the doctrine of unmistakable terms, not precluding, the ESA from serving as a subsequent legislative enactment. Id.

. N.M. Const. Art. XVI — states:
The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the state. Priority of appropriation shall give the better right.

. N.M. Stat. Ann. § 72-1-1 states:
All natural waters flowing in streams and watercourses, whether such be perennial, or torrential, within the limits of the state of New Mexico, belong to the public and are subject to appropriation for beneficial use.

. N.M. Stat. Ann. § 72-12-1 provides:
The water of underground streams, channels, artesian basins, reservoirs or lakes, having reasonably ascertainable boundaries, are declared to be public waters and to belong to the public and to be subject to appropriation for beneficial use.

.Compacts are agreements between states which Congress must approve. From the federal perspective, when Congress consents to these state agreements under the Compact Clause of the Constitution, Art. I, § 10, cl. 3, the compact becomes a "mechanism of legal control over affairs that are projected beyond State lines and yet may not call for, nor be capable of, national treatment.” Petty v. Tennessee-Missouri Bridge Comm’n, 359 U.S. 275, 282 n. 7, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959).

. "Beneficial use is 'a restrictive concept of valid water uses in the water law of the arid western states requiring that water only be used for purposes that are beneficial to the user and to society in general, such as irrigation and municipal uses.’ " Sharon P. Gross, The Galloway Project and the Colorado River Compacts, 25 Nat. Resources J. 935 (1985), quoting Prof. Albert E. Utton, Glossary of Terms Commonly Used in Water Law (1985). New Mexico law, generally, states that a beneficial use cannot include wasting water. See, e.g., Snow v. Abalos et al., 18 N.M. 681, 140 P. 1044, 1048 (1914) ("but it is the application to a beneficial use which gives the continuing right to divert and utilize the water.”).

. In its analysis, the court indicated that 43 U.S.C. § 620, contemplated investigating construction of "public recreational facilities” and "facilities to mitigate losses of and improve conditions for, the propagation of fish and wildlife.”

. In an abundance of caution, the City contends the district court's order interpreting its contract rights adversely to its interests gives it standing. We agree. Lujan v. Defenders of Wildlife, 504 U.S. 515, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

. It bears noting the City contracted with BOR on April 22, 1997, under the Reclamation Laws and the ESA, "to assure the water needs of the minnow and the irrigators within the Middle Rio Grande Conservancy District.” The two-year contract provided for BOR to purchase and use up to 30,000 a.f. of its SJC Project water from Abiquiu Reservoir "to augment the total water supply to the Middle Rio Grande Valley.” The contract reflects the City's commitment to protecting the silvery minnow.

. MRGCD is accountable to the New Mexico State Engineer who has monitored its water use. In fact State Engineer Thomas C. Tur-ney advised in a March 21, 2001 letter to BOR and the MRGCD that in the absence of *1135 MRGCD's filing the required state Proof of Beneficial Use, the State would assert in this litigation that “7.2 a.f. of water per acre of irrigated non-Pueblo lands on an annual basis is a sufficient and non-wasteful diversion of water.” This figure contrasts with the State’s “farm delivery requirement of 3.0 acre-feet per acre annually” and the MRGCD’s diverting "over 11 acre-feet per acre” from 1989 through 1999.

. 28 U.S.C. § 2409a(b) states:
b) The United States shall not be disturbed in possession or control of any real property involved in any action under this section pending a final judgment or decree, the conclusion of any appeal therefrom, and sixty days; and if the final determination shall be adverse to the United States, the United States nevertheless may retain such possession or control of the real property or of any part thereof as it may elect, upon payment to the person determined to be entitled thereto of an amount which upon such election the district court in the same action shall determine to be just compensation for such possession' or control.

. Klamath Water Users Association states in its amicus brief in support of appellants, "[t]he fact that the stored water in Heron Reservoir is imported makes appellants’ case particularly compelling, but it is not determinative. Practically and legally, diverting 'native' water to storage during surplus flow period is identical to importing water from another basin.”

. Moreover, a line of cases recognizes the difference between acquiring water rights and operating federal projects. Ivanhoe Irrigation Dist. v. McCracken, 357 U.S. 275, 291, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958). In Israel v. Morton, 549 F.2d 128, 132 (9th Cir.1977), the court stated:
A distinction must be recognized between the nature of nonproject water, such as natural-flow water, and project water, and between the manner in which rights to use of such waters are obtained. Right to use of natural-flow water is obtained in accordance with state law.... Project water, on the other hand, would not exist but for the fact that it has been developed by the United States.

. Moreover, as we have already noted, although MRGCD has not recognized the issue, under the doctrine of unmistakable terms, "the contract contemplates future changes in reclamation laws.” O’Neill, 50 F.3d at 686 (quoting Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986)).

. Non-Indian settlers constructed the ditches beginning as early as 1598, and the descendants of these Spanish settlers continue to live in the Rio Chama Valley, the Española area, and other parts of New Mexico and southern Colorado.